WILLIAM P. LORD, } *Associate Justices.*
W. W. THAYER,

## COGSWELL *v.* WILSON, ET AL.

A PARTNERSHIP is a contract of two or more competent persons to place their money, effects, labor and skill, or some, or all of them in lawful commerce or business, and to divide the profits and bear the loss in certain proportion. Mere community of interest is not sufficient, but there must be an agreement to share in the profits and loss; and such profits must be shared as the result of the adventure or enterprise in which both are interested, and not simply as a measure of compensation.

THE EXISTENCE of a partnership does not depend upon the fact that each partner has in all things complied with his agreement. If the contract has been made, property and labor contributed, and the partnership business commenced, there is a partnership until legally dissolved.

APPEAL from Lake County.

*John Kelsay and N. B. Knight,* for appellant.

*Stratton & Fullerton,* for respondent.

By the Court, LORD, J.:

This is a suit for the dissolution of a copartnership al-

leged to exist between one D. R. Jones and the defendant, H. C. Wilson, for an accounting and the appointment of a receiver. The plaintiff is a purchaser at an execution sale of all the right, title and interest of the said Jones in such alleged copartnership, and by reason thereof, alleges he is now the owner of all of such right, title and interest of the said Jones in the property of said copartnership, and not desirous himself of continuing such copartnership, he prays the appointment of a receiver, and for an accounting to the end that the liabilities of such copartnership may be paid and discharged, and his rights and interests as such purchaser may be ascertained and determined.

Upon issue being joined, the evidence in the case was taken and submitted, and the court below, finding that no partnership existed between the parties as alleged, dismissed the bill for want of equity. From this decree the plaintiff appeals and brings his suit to this court. The matter out of which the contention principally arises is in reference to a certain contract made and executed between the said Jones and the defendant, Wilson, for the purpose of forming a copartnership in the business of sheep raising, the terms and conditions of which the plaintiff claims have been substantially performed and carried into effect, whereby the partnership in question was established. The contract is as follows:

"Articles of agreement are concluded, this 19th day of June, A. D. one thousand eight hundred and seventy-five, between H. C. Wilson, Tehama county, California, party of the first part, and D. R. Jones, of Grant county, State of Oregon, party of the second part, witnesseth: That the said parties above named agree to and with each other, that they will enter into copartnership at Warner Lake, Grant county, Oregon, for the purpose of sheep raising, which occupation

is to be our specialty; H. C. Wilson, of the first part agrees to furnish two thousand head of sheep (or more as may be agreed upon) for the use of the co-partnership at the rate of three 50-100 dollars per head, and D. R. Jones of the second part agrees that after fifteen hundred dollars is taken from the half value, that he is to give his note to H. C. Wilson, of the first part, for the remainder of the one-half of the sheep at the same valuation, said note to draw interest at the rate of one per cent. per month from date until paid. That said H. C. Wilson, of the first part, agrees to make such payments on the lands that said copartnership may purchase from the state of Oregon, as university lands, or from the Oregon Central Military Company, (if such lands are purchased) which purchases may be at the discretion of both parties hereto; and the said H. C. Wilson agrees to make such payments on such lands as may be required for the year 1875, which will be the first payment, and the said D. R. Jones agrees to make the second payment, H. C. Wilson the third payment, and D. R. Jones the fourth payment. Each party hereto agreeing to pay one-half of the purchase price and all the expenses that may be incurred in the purchase of any or all of the said land that may be purchased from said parties above named, and also each party agreeing to pay one-half of all expenses incurred in the purchase and care of said sheep.

And it is further agreed by both parties hereto that said sheep and their increase is to be under the care and control of said H. C. Wilson, and that both of said parties are to put up such quantities of hay each season for said sheep as the said H. C. Wilson may think proper, to be done at the equal expense of both parties hereto. This agreement to go into effect as soon as M. Tipton relinquishes his right to the lands hereinbefore mentioned.

In witness whereof, we have hereunto set our hands this 19th day of June, A. D. 1875.

(Signed)    H. C. WILSON.

Done in presence of    (Signed)    D. R. JONES.

    Kaspar Kuble.

The defendant, Wilson, admits the execution of this contract, but denies that its terms or conditions, have ever been performed, or that any copartnership was ever formed, or established in pursuance of its provisions; and claims that, owing to the inability and failure of the said Jones to comply with his part of the said agreement, it was mutually abrogated and abandoned by them; that another and different arrangement was made, and a contract entered into between them in which it was expressly stipulated in writing that when Jones paid him a certain sum—the purchase price of the sheep—then only was he to deliver to Jones one-half of the band of sheep and their increase.

The first question for us to decide is: Was there a partnership? If there was, then it is not denied that an accounting is necessary for a proper settlement of the partnership affairs. A partnership has been defined to be a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profits and bear the loss in certain proportions. (3 Kent Com., 23; Story on Partn., sec. 2.) Mere community of interest is not sufficient, but there must be an agreement to share in the profits and loss. (*Holmes* v. *U. In. Co.*, John Cases, 329; *Post* v. *Kimberly*, 9 John's, 470.) Nor will an agreement to divide the gross earnings constitute individuals partners, but there must be an interest in the profits as profits, (*Pattison* v. *Blanchard*, 5 N. Y., 186; *Heims' heirs* v. *Howland*, 5 Denio, 68,) and

such profits must be shared as the result of the adventure or enterprise, in which both are interested, and not simply as a measure of compensation. (*Ogden* v. *Astor*, 4 Sandf., 311.) These references are sufficient to show that a communion of profit and loss is essential in order to constitute a partnership, and this, it would seem, is the true test to determine whether persons are partners or not. It will be observed by the terms of the agreement, that it is to go into effect as soon as Mr. Tipton relinquishes his right to the lands mentioned in the agreement. The evidence discloses that Jones, in pursuance of that agreement went to Linkville about the first of July, 1875, and saw Mr. Tipton, who relinquished all right he had to the lands referred to, and that he wrote to Wilson of this result, requesting him to send the money to Salem to pay for the land, and that subsequently the deed was sent to him. Jones also testifies that about the 10th of September, 1875, he went to Susan river for the purpose of receiving the sheep and bucks; that Wilson and another man drove them out of the corral, and that a man by the name of Johnson counted them as they came out of the shoot; that a man with him by the name of Moore drove the sheep and he drove the team; that the sheep were delivered to him by Wilson for the purposes of the copartnership, in pursuance of their agreement made at Jacksonville, and then driven to Warner valley, and the business of sheep raising thus commenced as provided in such agreement. Upon the question of the delivery of the sheep at this time, and as thus sworn to by Jones, the defendant, Wilson, testifies in substance that he did not deliver the sheep to Jones, but to Moore, who held the possession for him; that his reasons for so doing were that it had come to his knowledge that Jones was involved with debt, and to secure himself against loss and to avoid all possibility of

difficulty and annoyance, he put Moore in possession of the sheep, and that subsequently a written obligation was given by Jones to him, in which it was expressly stipulated that the delivery of the sheep should be postponed until full payment was made therefor.   This obligation is as follows:

" $2,624.30.   One day after date, I promise and bind myself and heirs to pay to H. C. Wilson, or order, the just and full sum of two thousand six hundred and twenty-four dollars and thirty cents, in gold coin, with interest at the rate of one per cent., in like gold coin, for a half interest in twenty-one hundred and twenty-six head of sheep.   The consideration of the above obligation is such, that when the said D. R. Jones, or his heirs, pay to H. C. Wilson the above named sum, with interest, then the said Wilson is to deliver to the said D. R. Jones one-half of the above band of sheep and their increase.

(Signed,)          D. R. JONES.

WARNER VALLEY, Grant Co, Oregon, Sept. 16, 1876."

To preserve the order of time, we shall defer reference to the endorsement on the back of this note or obligation, at present.   It will be noticed in the transaction, as thus far detailed, that there is no conflict in the evidence except as to whom the possession and delivery was given at Susan river—Jones testifying that the possession and delivery of the sheep was made to him by Wilson for the copartnership and in pursuance of the original agreement, and Wilson testifying that the possession and delivery of the sheep was not made to Jones, but to Moore to be held for him, and in further confirmation of which and to more particularly define their rights and interests in the premises, the note and obligation of Sept. 16, 1876, was given.   The contention of the defendant, Wilson, therefore is, that the original agreement

which contemplated his furnishing the band of sheep for the copartnership, and the giving by Jones his note to Wilson, after deducting the $1,500 from his half value, according to the terms thereof, was abandoned, because, as he claims, there were no sheep delivered to Jones for the copartnership at Susan river, as the express stipulation in the writing of Sept., 1876, is in contradiction of such delivery for the purpose of a copartnership in the sheep, as provided under the original agreement. It will be observed that more than a year intervenes between the original agreement and the note and obligation upon which the defendant relies to establish there was no delivery of the sheep to Jones at Susan river for the use of the alleged copartnership, and about a year from the time of the transaction at Susan river to the execution of the note. What was done prior to the Susan river transaction, and in furtherance of the contemplated copartnership, stands uncontradicted. To ascertain, then, whether the sheep were delivered to Jones and for the use of the partnership, or otherwise, becomes the important inquiry, and can only be determined in the light of all the surrounding facts and circumstances as disclosed by the evidence. It was about the 10th of September, 1875, that the sheep were counted out at Susan river, and then driven to Warner valley, the place designated by the original agreement for the copartnership to engage in the business of sheep raising. In a letter written by Wilson and mailed to Jones, dated Nov. 17, 1875, he says: "As soon as you get the sheep all right you send me your note, dated from the day you got the sheep, with interest, as understood by us. As life is uncertain and it saves misunderstanding hereafter, keep all the accounts pertaining to the sheep strict, so that there will be no misunderstanding." And, again: "When we want to sell, or divide, if the sheep do not do well, I will

not want to keep them there. Have the note sent, also, for half of the sheep, as I have nothing to show for what you owe me," &c. By this letter, written right on the heels of the Susan river transaction, it is quite clear that Wilson understood that Jones "got" the sheep and owed him for one-half of them, for which he was to give him his note; and this is in accordance with the original agreement and the testimony of Jones in respect to this matter; and, more, it not only recognizes, in effect, the possession of Jones of the whole band of sheep, but that he has a half interest in the ownership of them, and which in the event the "sheep do not do well" he is willing to "sell or divide," as may be deemed best under the circumstances.

If Jones had no possession or ownership, in the band of sheep, what did he have to "sell or divide," or that he "owes him," and for which the note is requested to be sent, "to show that you owe me?" In the light of what had preceded, and what was to be done, the import of this letter is plain and unmistakeable. It shows that Wilson understood that the possession was in Jones, for the partnership, and that Jones owed him for one-half of the sheep, as specified in the agreement—a construction and meaning which excludes and shuts out the suggestion that the delivery was to Moore to hold possession for him. And this is made still more evident by the fact that, in the settlement of their accounts—the correctness of which is not disputed—the sheep are not only treated as partnership property, but the services of Moore, as herder, are charged to the firm of Jones & Wilson, and paid for out of the funds of that firm. In another letter, written by Wilson to Jones, dated Dec. 27, 1875, he says: " I heard that Diggers attached you. Now, if there is any danger of your being attached, don't you claim any part of the sheep; tell them that they are all

mine, and we have that all understood in our contract between us. I will do exactly as I agreed." Now, there is no other contract in existence at this time, except the agreement made at Jacksonville, in June, 1875, and in pursuance of the terms of which, as we have seen, the sheep had been delivered to Jones for the partnership, and driven to Warner valley, where the partnership was to carry on the business of sheep raising. The reference, therefore, to the contract "understood between us," could not have alluded to the note and obligation, for that had not come into existence, but must, of necessity, referred to the one already existing and under which the partnership was formed, but according to the basis of which, at this time, Jones had become indebted to him for one-half of the sheep, less the amount specified, which Wilson probably felt would be endangered by the attachments. Hence the suggestion not to "claim any part of the sheep; tell them they are all mine," although contrary to the fact, and might place Jones in an embarrassing position, is followed by the assurance, "we have that all understood in our agreement between us," and " I will do exactly as I agreed."

We now come to the note and obligation. Jones testifies that the reason he did not send his note was on account of a misunderstanding in respect to the $1,500·to be deducted from the note to be given for his half interest in the band of sheep (a controversy which does not seem to be settled yet), and that when this note of Sept. 16th, 1876, was given, the latter clause of which postpones the delivery of the sheep until full payment is made therefor, it was inserted on account of his indebtedness to other parties, and to prevent any interference with their business, and at the suggestion of Mr. Wilson, who said to me, "you may put your property into my hands and I will protect you until you can pay

your debts; I do not want to help you swindle any one, but will protect you until you can pay your debts." And he further testifies, that it was put into Wilson's hands, not to avoid the payment of his debts, or to defraud his creditors, but so that Mr. Wilson could protect him until such time as he could pay. In another letter, written in 1879, Wilson says: "You say you have placed your property into my hands. Now, if you are afraid to trust me with your property, I will give you back your papers when we meet, and settle, if you want them. It was only through a suggestion of your own that you turned your property to me, and I thought I was accommodating you."

In explanation of this, Wilson testifies it only refers to a wagon and team, which Jones fearing would be attached turned it over to him by a bill of sale, and that subsequently, he paid him for them. Now, turning to the settlement of these accounts, we find that all property furnished by Jones and including the team valued at $500, was charged to the copartnership. The same is true, too, of the property furnished by Wilson; the sheep and bucks first delivered by Wilson, as also the bucks subsequently purchased, were charged to the copartnership. These accounts show, too, that Jones became equally liable with Wilson for supplies furnished by Ayers & Sewell for the use of the copartnership, and that one-half of the money arising from the sale of the wool clipped from the sheep, after deducting expenses, was placed to the credit of Jones. He receives credit, too, for one-half of the proceeds of the sale of wethers sold out of these sheep. The twenty per cent. paid to the state for the land used in the sheep business, the expenses of Wilson going to Salem in respect to it, and the taxes thereon are charged to the copartnership. Nor is the allegation in the complaint that Jones paid for one-half of the

sheep, denied in the answer.   The code provides that every material allegation, not specifically controverted in the answer, shall for the purpose of the action, be taken as true. (Code, sec. 92.)   This, however, may have been an oversight.   But the payments admitted to have been made by Jones and endorsed by Wilson on the back of the note inclusive of the $1500, for which Jones claims he is entitled to be credited as provided by their articles of copartnership, would pay the note, or liquidate the amount Jones owed for the sheep.   The evidence in respect to the land is not clear and definite.   In fact, it is difficult to determine by the record before us just what relation it bore to the partnership.   That it was used by the partnership for the purposes of its business, seems incontestable.   There are, however, some facts disclosed by the evidence of Wilson, which would indicate that it did not constitute a part of the partnership property, or at least, not the whole of it.   Just what the truth is, in this regard, we are not able, nor is it necessary now for us to determine.   But looking at all the facts and circumstances which surround this transaction from its inception in 1875 to 1881, when proceedings were instituted which have resulted in the present suit, we are satisfied that a partnership existed between Jones and the defendant, Wilson.

All things may not have been done precisely as agreed and contemplated by the agreement for a copartnership. Nor in all cases is this absolutely necessary.   In *Hartman* v. *Woehr*, 18 N. J. Eq., 383, it is held that the existence of a partnership does not depend upon the fact that each partner has in all things complied with his agreement.   If the contract has been made, property and labor contributed and the partnership business commenced, there is a partnership

until legally dissolved. Having reached the conclusion that there was a partnership, how much interest Jones had in such partnership can be determined on the accounting.

The decree must, therefore, be reversed and the suit remanded for an accounting.