Decided 4 August; rehearing denied 3 November, 1902.

## HANTHORN v. QUINN.

[69 Pac. 817.]

AGREEMENT NOT CONSTITUTING A PARTNERSHIP.

A contract by which defendant leases fishery grounds to plaintiff, who agrees to establish and operate a fishery, advancing all money necessary therefor, and to pay defendant half the net proceeds as rental, and it is agreed that each shall bear half the cost of the improvements, and of maintaining and operating the fishery, is not a partnership, so that, plaintiff not having established a fishery, but merely made an abortive attempt, defendant is not bound to pay any of the cost.

EXCUSE FOR BREACH OF CONTRACT.

That work was more expensive than any one anticipated is no excuse for breach of a contract to do it.

From Columbia: THOMAS A. McBRIDE, Judge.

This is a suit by J. O. Hanthorn against James Quinn for the dissolution of an alleged partnership, and for an accounting. The defendant is the owner of fishing grounds and a fishing right on the Columbia River. Prior to 1894 he had operated fish traps thereon, but they were partly washed out and destroyed by the flood of that year. In the fall, he approached the plaintiff, who is a cannery man in Astoria, with the design of making some arrangement by which the ground could be cleared of the remnants of the fish traps, and oper-

ated as a seining ground. The plaintiff agreed to examine into the matter, and ascertain whether the project was feasible. After making a somewhat careful examination, and believing that the ground could be profitably operated as a fishery, he made an offer to buy the property, which the defendant declined, but proposed "to go in with him on some proposition." After discussing the matter for a time, the parties executed the following written agreement:

"This Agreement, made and entered into this 11th day of March, 1895, by and between James Quinn and Jane S. Quinn, his wife, of Columbia County, Oregon, and J. O. Hanthorn, of Astoria, Clatsop County, Oregon, witnesseth:

"*First,* That the said James Quinn and Jane S. Quinn, in consideration of the sum of one dollar and other valuable consideration to them in hand paid by the said J. O. Hanthorn, the receipt whereof is hereby acknowledged, and the further consideration of the several and the mutual agreements of the parties hereto, herein contained, to be by them kept and performed, have let, leased, and demised, and by these presents do let, lease, and demise, unto the said J. O. Hanthorn, his heirs and assigns, for a term of ten years from the date hereof, for fishery purposes, the following described rights and premises, to wit:

" (1) All the shore, between high and low-water marks, of the Columbia River adjacent to that portion of the Eben Weld donation land claim in Columbia County, Oregon, now owned by them, together with all fishery rights and privileges now owned by them, or which they may hereafter acquire, in front of said premises, in the waters of the Columbia River; *provided,* that no seines shall be drawn or traps constructed upon any portion of said premises lying within one thousand feet of the northwest corner of the premises owned by said James Quinn and Jane S. Quinn, save and excepting one trap, which may be constructed at or near the west line of said premises.

" (2) That tract or parcel of land bounded by beginning at a point in the shore line of the Columbia River twelve hundred and sixty feet easterly or northeasterly from the northwesterly corner of the said portion of the said Eben Weld donation claim, now owned by them, and running thence, easterly or northeasterly, along the said shore line, a distance of one thousand feet; thence easterly or southeasterly, at right angles to said shore line, a distance of one hundred feet;

thence westerly or southwesterly, a distance of one thousand
feet, to a point one hundred feet distant from the place of
beginning; and thence to the place of beginning,—for the pur-
pose of erecting thereon any and all structures convenient and
desirable for use in carrying on a fishery upon and in front of
the shore of the Columbia River.

"(3) The joint use, with ourselves, of the wharf now con-
structed and situate upon the leased premises at a point com-
monly known as 'Quinn's Landing.'

"(4) A right of way over said Eben Weld donation land
claim, adjacent to the said shore, above described, of sufficient
width for the construction of a road thereon, by which all por-
tions of the said shore may be reached, together with the right
to construct such a road thereon as may be deemed desirable
and convenient in carrying on the fishing business on said
leased premises, and for the purpose of drawing and landing
seines and other fishing gear or fish thereon, or for landing or
moving thereon utensils and materials for the construction of
fish traps, or other structures for the taking and landing of
fish thereon.

"(5) The privilege of pasturing upon their lands, includ-
ing the said donation land claim of Eben Weld and other
lands adjacent thereto, at all times of the year, all horses and
other stock used by the said J. O. Hanthorn in carrying on
and operating a fishery on the premises herein leased to him,
or which may hereafter be leased to him, pursuant to the
terms and conditions of this agreement.

"And we, the said James Quinn and Jane S. Quinn, do
hereby covenant and agree with the said J. O. Hanthorn that
we are the owners and are in possession of the premises, rights,
and privileges hereinbefore described, and that we will, and
our heirs, executors, and administrators shall, warrant and
defend the said J. O. Hanthorn, his heirs, executors, admin-
istrators, and assigns, in the peaceable use and occupation
and enjoyment of the said leased premises, for and during the
term for which this lease is given, against the lawful claims
and demands of all persons whomsoever.

"*Second,* That the said J. O. Hanthorn, in consideration of
the premises, and of the covenants and agreements of the said
James Quinn and Jane S. Quinn, herein contained, hereby
covenants and agrees that he will take charge of the aforesaid
described premises and rights and privileges, and will, in the
first instance, each year, advance all moneys necessary there-
for, and will construct all necessary buildings, and make all
necessary improvements, and supply all necessary gear and

plant, in order to establish and operate upon said leased premises a fishery for catching salmon and other fish, and will operate, conduct, and carry on said fishery, and will either take the fish caught thereat at a price not less than the average price paid for such fish by the cannery men on the Columbia River, at the time, or sell and dispose of the same to other parties at such price or prices, and will keep full and correct books of account of all transactions relating thereto, which books shall at all times be open to the inspection of all parties interested therein, and pay over to the said James Quinn, at the end of each fishing season, one half the net proceeds derived from said fishery, after paying all expenses and indebtedness incurred in establishing, conducting, and operating the same.

"And it is hereby mutually agreed, by and between the said James Quinn and J. O. Hanthorn:

"(1) That they will each bear one half of the cost and expense of said buildings, improvements, and gear and plant, and the necessary cost and expense of maintaining and operating said fishery and everything connected therewith, and that they will share equally in the profits and losses of said fishery.

"(2) That in the event of the said James Quinn, or the said J. O. Hanthorn, desiring to sell or dispose of his interest in said fishery, or the proceeds arising therefrom, or of any interest he may have in this contract, he shall give to the other the first privilege of buying the same, at the price, and upon the terms, at which it is offered. ·

"*Third,* That the said James Quinn and Jane S. Quinn, in consideration of the said payments, and of the individual and mutual agreements of the parties hereto, hereinbefore contained, hereby agree that the said J. O. Hanthorn, his heirs or assigns, shall have the first right or option to purchase, at the average going price paid at the time by cannery men on the Columbia River for such fish, any and all fish caught by them, or by any other person or persons, upon any lands or premises now owned or controlled by them, and which is contiguous to the said Eben Weld donation land claim, or any tract which is contiguous thereto, or the shore adjacent thereto, during the term for which this lease is given, and so long as the said lands and premises shall be owned by them or their heirs; and in the event of their desiring to sell or lease any such lands or premises which are suitable for fishery purposes, separate from their other lands, if the same are offered for sale, the said J. O. Hanthorn, his heirs or assigns, shall have the first right to purchase the same, at the price and upon the terms at which they are offered, and, in the event of their desiring to lease the

same, then the said J. O. Hanthorn, his heirs or assigns, shall have the first right to lease the same upon the same terms and conditions are contained in this lease.

"In witness whereof, the parties hereto have hereunto set their hands and seals, the day and year first above written. In duplicate:

Executed in presence of—      Jane S. Quinn.        [Seal.]
    Frank J. Taylor,          James Quinn.          [Seal.]
    Charles E. Runyon.        James O. Hanthorn.    [Seal.]

"State of Oregon, County of Clatsop—ss.:  This certifies that on this 11th day of March, 1895, before me, a Notary Public in and for the State of Oregon, personally came the above named James Quinn and Jane S. Quinn, who are personally known to me to be the persons described in, and who executed, the same, freely and voluntarily, for the uses and purposes therein named.

In testimony whereof I have hereunto set my hand and affixed my notarial seal the day and year last above written.
    [Seal.]                           FRANK J. TAYLOR,
                                  Notary Public for Oregon."

The plaintiff thereupon proceeded with the work of preparing the grounds referred to in the agreement for fishery purposes, which he continued until the spring of 1898, but owing to the difficulties encountered in removing the snags, piling, and other remnants of the wrecked fish traps, he did not succeed in his effort, and his expenses exceeded the receipts about $16,000. In the fall of 1897, he demanded of the defendant repayment of one half the money so expended to that time, with which demand the defendant refused to comply, claiming that he was not liable under the contract for any part of such expenses. The plaintiff, nevertheless, tried, during the spring of 1898, to put the ground in proper condition for a fishery, but without success. He thereupon abandoned further effort in that direction, but in the fall of the year undertook to erect a fish trap on the ground, whereupon the defendant and his wife notified him in writing that they declined to further recognize as valid the contract set out in the complaint. The business in connection with the proposed fishery was conducted under the name of Hanthorn & Quinn, and all

books of account kept, and all bills rendered, in that name. The plaintiff, however, had entire control thereof, hired and discharged all employes, and furnished the means with which to pay the expenses. The defendant, who resided near by, took considerable interest in the work, advised with the plaintiff from time to time, was familiar with the progress thereof, and at the plaintiff's request O. K.'d or approved a part of the time checks and bills incurred in its prosecution. After defendant's refusal to pay any part of the money advanced and expended by the plaintiff in attempting to establish a fishery on the leased premises, and his notice to plaintiff to desist from the further use thereof for any purpose whatever, this suit was brought for an accounting; the complaint alleging that the defendant and plaintiff were partners in the enterprise, and that, as such, the defendant was liable for one half the losses incurred in the venture. The defendant admits the execution of the contract, but denies the alleged partnership, and his liability for any part of the expenses incurred by the plaintiff under the agreement, and affirmatively alleges that the agreement as executed does not express all the terms and conditions agreed on, inasmuch as it does not expressly provide that he should not be liable for any losses incurred. After the testimony on behalf of the plaintiff had been taken, the defendant moved to dismiss the suit, and for a decree against the plaintiff for costs and disbursements, but the motion being overruled, and the case submitted on the testimony of both parties, the court found that the partnership existed as alleged, and that plaintiff was entitled to a decree against the defendant for one half the amount expended by him in and about the establishment of a fishery, over and above a small amount received therefrom, less one half the proceeds of the partnership property. From this decree, the defendant appeals.                                    REVERSED.

For appellant there was a brief over the name of *Cotton, Teal & Minor*, with an oral argument by *Mr. Joseph N. Teal.*

For respondent there was a brief over the names of *Frank*

*J. Taylor* and *Fulton Bros.*, with an oral argument by *Mr. Taylor* and *Mr. Chas. W. Fulton.*

MR. JUSTICE BEAN, after stating the facts, delivered the opinion of the court.

There is no controversy as to the amount to be recovered in case the defendant is liable. Nor is there any serious question that the written contract set out in the complaint does not embody the terms of the agreement between the parties. The defendant alleges, and gave some evidence tending to show, that it should have contained a provision exonerating him from liability for any losses incurred in conducting the enterprise, and that it was omitted from the agreement by mistake; but it is very clear from the testimony that the written instrument contains the actual terms of the contract between the parties, and was so understood by them before it was executed. The defendant admits that the question of probable losses was discussed while the contract was in course of preparation, but says it was understood that he should not be liable for any loss, and it was intended that such a provision should be inserted in the contract. Judge Taylor, who prepared the contract, on the other hand, says that the question was mentioned, and he told the parties that then was the time to settle all such matters, as the written contract after its execution, would prevail; that plaintiff and defendant talked the subject over, and finally came to an agreement upon that point, which was first reduced to writing in pencil, read over to the parties, and, after having been finally agreed upon, embodied in the contract, which was then read over to and signed by the parties in duplicate. The plaintiff says that when, in the preparation of the agreement, they came to the question of profits and losses, the defendant and his wife suggested that he should take all the chances, but he refused to accede to that proposition, and told them, if they insisted upon it, he would go no further with the agreement; that it was finally understood and agreed that they should share equally in the losses, if any, and the contract was prepared

and executed accordingly. The written contract must there-
fore be taken to express the real agreement of the parties, and
the only question for determination is whether, under its pro-
visions, the defendant is liable for one half the expenses in-
curred by the plaintiff in the unsuccessful attempt to establish
and conduct a fishery on the premises described therein.

The complaint alleges, and the court below found, that the
plaintiff and defendant were partners in the enterprise, and
that defendant is liable as such for one half the losses. A part-
nership is defined as a voluntary contract between two or more
persons agreeing to put their money, effects, labor, and skill,
or either or all, in some lawful enterprise or business, with a
view of dividing the profits or sharing the losses which result
therefrom (*Flower* v. *Barnekoff*, 20 Or. 132, 25 Pac. 370, 11
L. R. A. 149); or, as defined by Mr. Justice MOORE, it is "an
agreement, entered into between two or more persons, to unite
their labor, skill, money, and property, or either or all of them,
in a lawful enterprise for their mutual account": *Willis* v.
*Crawford*, 38 Or. 522 (63 Pac. 985, 64 Pac. 866, 53 L. R. A.
904). In determining whether a partnership exists between
two or more persons, the intention of the parties must govern,
and, where the facts are given, the question is one of law for
the court, from the whole contract, regardless of what the par-
ties may call their agreement, or of special expressions or pro-
visions therein: 1 Bates, Partn. § 17. Among the essential
elements of every partnership are a community of interest in
the property and business, and the right of survivorship.
Every member of a partnership is a principal having a joint
interest in the property,—is an agent of his associates,—and,
upon the death of his partner, is entitled to retain and dispose
of the partnership effects in the settlement of its affairs. A
mere agreement to share in the profits and losses of an enter-
prise does not of itself create a partnership: Bates, Partn.
§ 29; *Shrum* v. *Simpson*, 155 Ind. 160 (57 N. E. 708, 49 L. R. A.
792); *Eastman* v. *Clark*, 53 N. H. 279 (16 Am. Rep. 192).
"One essential element of a partnership," says Mr. Justice
SHEPLEY, "is a community of interest in the subject-matter of

it. * * From this arises the right of each partner to make contracts, incur liabilities, manage the whole business, and dispose of the whole property of the partnership, for its purpose, in the same manner and with the same power as all the partners could when acting together. Another element is that, upon the dissolution of the partnership by the death of one of the partners, the survivors become entitled to retain and dispose of the partnership effects for a settlement of all its affairs, and for a distribution of the remaining fund. However the arrangement of business may assimilate it to a partnership, if it be such that on the death of one interested this becomes impossible, it will be evidence that there was no proper partnership existing": *Dwinel* v. *Stone*, 30 Me. 384. And in *Roper* v. *Schaefer*, 35 Mo. App. 30, the law is said to be "that simple participation in the profits and losses of a business does not constitute a partnership, but there must be such a community of interest as enables each party to make contracts, manage the business, and dispose of the whole property; and this rule is the same as to third persons, unless the party sought to be charged has so acted as to lead the plaintiff to believe a partnership to exist, and to act upon such a belief." So, also, in *Ashby* v. *Shaw*, 82 Mo. 76: "The relation of partnership does not exist between persons associated in a common undertaking, unless each one has the right to manage the whole business, and to dispose of the entire property involved in the enterprise, for its purpose, in the same manner and with the same power as all can when acting together."

By the application of these principles to the facts, it is not difficult to determine whether a partnership actually existed between the plaintiff and the defendant. Turning to the written agreement, from the terms of which this question must be determined, we find that its salient features are: (1) That the defendant and wife "let, leased, and demised" to the plaintiff, "his heirs and assigns, for a term of ten years, * * for fishery purposes," certain described rights and premises, in consideration of the sum of $1 and other valuable consideration; (2) a joint use was given the plaintiff with the defendant of a

certain wharf; (3) the plaintiff was given the privilege of
pasturage for "all horses and other stock used by" him "in
carrying on and operating a fishery" on the leased premises;
and (4) the lessor warranted peaceable use and enjoyment of
the premises to the plaintiff, "his heirs, executors," etc. In
consideration of these covenants and agreements on the part
of the defendant, the plaintiff agreed: (1) that he would take
charge of the premises, and "will, in the first instance, each
year, advance all moneys necessary therefor, and will con-
struct all necessary buildings, and make all necessary im-
provements," etc., "in order to establish and operate upon
said leased premises a fishery," etc.; (2) that he would "oper-
ate, conduct, and carry on said fishery," and dispose of the
fish caught, as provided in the contract; (3) that he would
keep books of account covering all the transactions, which
should be open to the inspection of all parties interested;
(4) that at the end of each fishing season, he would pay to the
defendant "one half the net proceeds derived from said fishery,
after paying all expenses and indebtedness incurred in estab-
lishing, conducting, and operating the same." So far, it is
clear. The contract is nothing more than a mere lease from
the defendant to the plaintiff of certain fishery grounds, with
an agreement on his part to establish a fishery thereon, to
operate the same, and pay to the defendant one half the net
proceeds as rental. But the next clause is the one that has
given rise to this litigation. By it plaintiff and defendant
mutually agreed "that they will each bear one half of the cost
and expense of said buildings, improvements, and gear and
plant, and the necessary cost and expense of maintaining and
operating said fishery, and everything connected therewith, and
that they will share equally in the profits and losses of said
fishery." The plaintiff's position is that by this stipulation, in
connection with the previous agreement on his part to, "in the
first instance, each year, advance all moneys necessary there-
for," and construct the necessary buildings, etc., in order to
establish and operate a fishery, etc., the parties became in
effect partners, jointly interested in the business, and liable

equally for the losses incurred therein. Standing alone, and without reference to the context, the clause would seem to support the plaintiff's contention, but it must be interpreted in connection with the other provisions of the contract, and the evident purpose of the agreement, so as to carry out the intentions of the parties thereto.

Taking the agreement as a whole, we do not think it created the relation of partners between the plaintiff and defendant. On its face it purports to be, and is, nothing more than a lease by defendant to the plaintiff of certain described premises and fishing rights for the term of ten years, and has none of the ordinary characteristics of a partnership agreement. There is to be no community of interest between the plaintiff and defendant in the property belonging to the proposed fishery, or in the business, nor is the defendant to have any control thereof, or make any contracts with reference thereto. The plaintiff is given the entire and exclusive possession of the leased premises, and of the management and control of the fishery and of the business connected therewith. The defendant has no voice in the matter whatever. He has no power to make contracts, incur liabilities, to bind the fishery or property, to manage the business, sell or dispose of the fishery or its products, and, if the plaintiff had died, could not, as a partner, have retained and disposed of the property. The situation of the parties, the evident purpose and object of the agreement, its terms and provisions, and the manner in which the business was to be conducted, are wholly inconsistent with the theory of a partnership. Under such an interpretation of the contract, the defendant was putting into the partnership business valuable fishing grounds and wharfage rights without any compensation whatever, and was irrevocably vesting in the plaintiff, not only the exclusive possession of the leased premises for the term of ten years, but the right to make such contracts, incur such liabilities, and expend such sums of money in connection with the proposed fishery, during the entire term of the lease, as in his judgment might seem advisable, and the defendant would be liable for one half

thereof, although excluded from any participation in the management or control of the business. It is impossible to believe that either of the parties intended any such agreement.

It may be said, however, that it is immaterial, for the purpose of this case, whether the plaintiff and defendant became partners under the terms of the agreement, since it is provided therein that they will each bear one half the cost and expense of establishing and operating a fishery on the premises described in the complaint, and will share equally in the profits and losses thereof. But before the plaintiff can recover under this provision, unless the defendant is to be deemed a partner, and the case disposed of on equitable principles applicable to such relationship, he must show that he has complied with the terms of the contract on his part; and this, it is substantially admitted, he failed to do. Under the contract, he agreed to construct all necessary buildings, make all necessary improvements, and supply all necessary gear and plant, "in order to establish and operate upon said leased premises a fishery," advancing, in the first instance, all moneys necessary therefor. And before he has a right of action against the defendant, under the profit and loss clause of the agreement, he must show that he has, in fact, established and operated a fishery upon such premises; and this he has not done. By the agreement, the defendant stipulated that he would bear one half of the cost and expense of such buildings, gear, and plant as might be necessary to establish the fishery, and one half of the expense of operating the same, and would share equally with the plaintiff in the profits and losses of "said fishery." But unless a fishery was in fact established by the plaintiff, as provided in the contract, there was no obligation on his part. He did not agree to make any advances, or in any way reimburse the plaintiff for money expended in an abortive attempt to establish one. Now the evidence shows, and it is not seriously disputed, that plaintiff never did establish a fishery on the leased premises, because he did not succeed in removing the snags, piling, and other

obstructions, so that the ground could be successfully used for seining purposes. After three or four years of ineffectual effort, finding that the expense was so much more than had been anticipated, he practically abandoned the enterprise. The evidence shows that it was possible to clear the ground so that it could have been made available for fishing purposes. The fact that the work was more expensive than plaintiff or any one else anticipated is no excuse for his failure to comply with the terms of his contract. ''If,'' as said by the Supreme Court of Minnesota in *Stees* v. *Leonard,* 20 Minn. 494 (Gil. 448), ''a man bind himself, by a positive, express contract, to do an act in itself possible, he must perform his engagement unless prevented by the act of God, the law, or the other party to the contract. No hardship, no unforeseen hindrance, no difficulty short of impossibility, will excuse him from doing what he has expressly agreed to do. This doctrine may sometimes seem to bear heavily upon contractors, but, in such cases, the hardship is attributable, not to the law, but to the contractor himself, who has improvidently assumed an absolute, when he might have undertaken only a qualified, liability. The law does no more than enforce the contract as the parties themselves have made it. Many cases, illustrating the application of the doctrine to every variety of contract, are collected in the note to *Cutter* v. *Powell,* 2 Smith Lead. Cas. 1.''

And, in *Stone* v. *Dennis,* 3 Port. 231, at page 241, it is said: ''Where a contract does not contain, on its face, anything impossible, illegal, or immoral, and where there does not appear to have arisen anything subsequent, in the making of it, which renders it so, and it is founded upon a sufficient consideration, the party making it is held to its performance. It is the duty of the contracting parties to provide against contingencies; they are presumed to know whether the completion of the duty they undertake be within their power. Therefore, to excuse them from the performance of their contracts, they must bring themselves within some one of the above provisions. Without it, however hard the case may be, the party

is held to his contract." In the recent case of *Sun Pr. & Pub.
Co.* v. *Moore,* 183 U. S. 642 (22 Sup. Ct. 240), Mr. Justice
WHITE says: "A court of law possesses no dispensing pow-
ers; it cannot inquire whether the parties have acted wisely
or rashly in respect to any stipulation they may have thought
proper to introduce into their agreements. If they are com-
petent to contract within the prudential rules the law has
fixed as to parties, and there has been no fraud, circumven-
tion, or illegality in the case, the court is bound to enforce
the agreement. Men may enter into improvident contracts
where the advantage is knowingly and strikingly against
them; they may also expend their property upon idle or worth-
less objects, or give it away, if they please, without an equiv-
alent, in spite of the powers or interference of the court."
It follows, therefore, that, however onerous the agreement on
the part of the plaintiff to establish and operate a fishery
upon the leased ground proved to be by actual experience, the
hardship affords no excuse for his failure to perform his con-
tract, or ground for relief as against the defendant. He did
not, in fact, establish and operate a fishery; and this was a
condition precedent to his right to enforce against the de-
fendant the provision requiring the latter to share in the
profits and losses of the fishery to be established. It follows
that the decree of the court below must be reversed, and it is
so ordered.                                    REVERSED.