Argued June 24, decided October 6, 1908.

## JONES *v.* CALIFORNIA & OREGON LAND CO.

[97 Pac. 625.]

ADVERSE POSSESSION—HOSTILE CHARACTER OF POSSESSION—EVIDENCE —SUFFICIENCY.

1. Evidence examined and *held* insufficient to establish title by adverse possession.

LANDLORD AND TENANT—ADVERSE POSSESSION.

2. One's possession under a lease must be presumed to continue until it is established by proof that he has surrendered, or otherwise repudiated, the lease.

From Lake: HENRY L. BENSON, Judge.

This is a suit by Ellen Jones, executrix of the last will and testament of D. R. Jones, deceased, Minnie Wallace, Alice Laird, David R. Jones, Jr., Sallie Riggs, Ellen Jones and Ellen Jones, Jr., against the California and Oregon Land Company, to quiet title to certain lands in Lake County, Oregon. From a decree in favor of defendant, plaintiffs appeal.

Statement by MR. JUSTICE EAKIN.

This is a suit to quiet title ·to the west ½ of section 33, township 36 south, range 24 east, Willamette Meridian, in Lake County, Oregon.

Plaintiffs allege ownership and possession as heirs and devisees of D. R. Jones, deceased, relying upon title by adverse possession for more than 20 years, and alleging that defendant claims some right, title, or inter-·est therein, and asking that plaintiffs' right and title be declared by decree of the court.

Defendant, by answer, alleges that it is the owner of the property in fee simple, and that in the year 1874 it leased said property to said D. R. Jones, plaintiffs' ancestor, for an indefinite term, and that he occupied the same thereunder until the time of his death, October 19, 1901.

For reply plaintiffs deny that they or their ancestor occupied under lease; that, if any lease was ever made

by defendant to D. R. Jones, it was abandoned and renounced by defendant; and that plaintiffs have at all times repudiated any interest in said property as tenants.

The cause was tried by the court, and it found that defendant has the legal title to said property, acquired from the United States by defendant's predecessor in interest, the Oregon Central Military Wagon Road Company, on April 18, 1871, and that plaintiffs have not established title thereto by adverse possession, and a decree was rendered thereon quieting defendant's title thereto.                                     AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. Edward S. J. McAllister.*

For respondent there was a brief and an oral argument by *Mr. J. B. Kerr.*

MR. JUSTICE EAKIN delivered the opinion of the court.

It is practically conceded that defendant has established its legal title to the land in question by mesne conveyances from the United States, under the act of Congress approved July 2, 1864 (chapter 213, 13 Stat. 355), entitled "An act granting land to the State of Oregon to aid in the construction of a military road from Eugene City to the eastern boundary of said State," and a subsequent act, approved December 26, 1866 (chapter 5, 14 Stat. 374), amendatory thereof, also the act of the legislative assembly of the State of Oregon, entitled "An act to donate land to the Oregon Central Military Wagon Road Company," approved October 24, 1864, the selection of which land was made by the Oregon Central Military Wagon Road Company and approved by the Department of the Interior on April 21, 1871, which included the west ½ of said section 33, and plaintiffs claim title thereto by adverse possession thereof against the defendant and its predecessors in interest for more than 20 years.

D. R. Jones, plaintiffs' ancestor, entered upon this land, or a portion of it, in 1867 as a squatter, with intent to acquire title thereto from the government of the United States by pre-emption or homestead entry, and, with the exception of the year 1876, resided upon and occupied it until 1899, and thereafter, until his death in 1901, he leased it to tenants, who paid rent to him, and since his death plaintiffs have continued to rent it and collect the rents therefor. D. R. Jones made no effort to file a pre-emption claim on the land prior to the 21st day of April, 1871, when the Oregon Central Military Road Company's selection of lands, under the grants above mentioned, had been made and approved by the Department of the Interior, and after that his application to file thereon was refused at the United States land office, for the reason that the land was included in said approved selection, and therefore not subject to entry, and Jones in the year 1874 abandoned any claim thereto as a pre-emptor.

1. The first important issue in the case is whether thereafter Jones' possession of the land was under a lease or agreement with defendant's predecessor in interest, the Oregon Central Military Road Company. In 1874 there seems to have been some controversy between D. R. Jones and the Oregon Central Military Road Company as to Jones' right to the west ½ of said section 33, under the pre-emption laws, and, to adjust such controversy, an agreement was entered into between them resulting in a lease by the company to Jones of three sections which included the west ½ of section 33, with a provision by which Jones was to have possession of this half section until offered for sale by the company, and then to have the preference right to purchase it. Col. Cogswell testifies that in 1881 two notes against D. R. Jones were sent to him by the company for collection, each for the sum of $250, saying:

"It recited that they were for rent of sections 27, 29, and 33, township 6 south, of range 24 east. I think it

was for the years of 1874 and 1875, that they were for the rent. I saw Mr. Jones, and called his attention to the notes, and he said that he could not pay them. He didn't have anything that he could pay with, and the question arose in regard to tne land, and he said that he had surrendered possession of sections ·27, 29, and the east half of section 33. He said that the notes, while it said in the notes they were for the rent of the three sections, yet really he was to pay $100 a section, and there was no rent for the west half of section 33. But they gave him a lease of all of it, and he gave his notes for the rent, and they were all put in, and said they were put in 33, the whole of 33, so that he could show the people how he held it, and keep trespassers off who might want to cut hay on it. That led up to the general conversation, and his statement to me of the case was this: That when the officers of the wagon road company came .to make their definite ·location of the road, and survey the land, that he was on the northwest quarter of that section, and was entitled to a pre-emption, and the officers agreed that if he would not claim his pre-emptive right that they would let him have the privilege of buying the land, the first right to purchase the land whenever they sold it, he said, at $1.25 an acre, and he was to have the use of the land until they got ready to sell it. * * I asked him if he had any written agreement of that kind, and he said that he did have. He brought it to me and showed it to me."

He further said:

"I am quite positive that the agreement which Mr. Jones produced is now on file in the Supreme Court in the case of C. A. Cogswell against Henry C. Wilson."

Mrs. Jones denies this lease in terms, but says Mr. Pengra and Mr. Colby, president of the road company, were at her house, but she knows nothing about the giving of the notes for rent of this section. She says:

"I know they were having some kind of a deal. I didn't know what it was."

Again on page 29 (of the transcript) she says she does not know anything about giving the notes.

"I was sick at the time when Colby and Pengra were there. I was at Bidwell under the doctor's care. What arrangements they made I don't know."

And as to the date when Pengra and Colby were at the place Mrs. Jones says:

"I met them in 1874. They were at the ranch in 1874. They were our guests for several days.

Q. Were these the same parties that Col. Cogswell claimed had signed a contract or something of the sort?

A. They were. They were the same parties; but Mr. Jones never signed any contract. I know he didn't. They were after him to sign a contract, and I told him he should not do it, shouldn't sign any contract, and he never did. * * They walked around over the land and looked at it and talked about it, trying to get Mr. Jones to sign a contract to that effect, but he never did. I know he didn't."

This shows that she was not in a position to know that Jones did not make the agreement, and shows that it was talked of and might have been signed. Cogswell's testimony on this question is corroborated by Wilshire, an attorney to whom Jones stated in 1891 that he had been advised that, under his contract with the company, he could not claim adversely to it, and afterwards stated that he had a lease, and could not claim by adverse possession. This was during the time Wilson was claiming the land as swamp land. Col. Cogswell also testifies that Jones asked him several times prior to the time the land was offered for sale by the company, to find out for him what the land could be bought for, indicating that he expected to purchase it, as specified by his lease. In the year 1876 Jones removed his family from the land to Ft. Bidwell, and they were gone about a year. Mrs. Jones testified that they removed from the land at that time because they were ordered off by Mr. Stone, the road company's agent, and, when they returned to the land in the fall of 1877, they held it adversely to the road company. This, however,

is inconsistent with Jones' subsequent conduct. In 1881 he admitted to Col. Cogswell that he was holding under the lease, as shown by the testimony quoted, "so he could show the people how he held it, and keep trespassers off who might want to cut hay on it." His holding under the lease was also recognized in 1881 in the suit of *Cogswell* v. *Wilson,* 11 Or. 371 (4 Pac. 1130), for an accounting of the partnership of D. R. Jones and Wilson, in which Cogswell had succeeded to the interest of D. R. Jones in the said partnership. And again, in 1887, D. R. Jones claimed under it to prevent the company from making a lease of this half section to Alexander, and the company recognized his claim thereafter and eliminated the west half of said section 33 from the lease. Cogswell testified that Ross, the company's agent:

"Leased the whole of section 33 to Alexander, C. G. Alexander, and Mr. Alexander was going to take possession, and Mr. Jones came over to see me about it. * * I went to see Ross, and told him the circumstances under which Jones had it, and told him that Jones had released his pre-emptive right, and was to have possession of that land until it was sold, and then he was to have the first right to purchase it, and Ross saw Alexander, and changed the lease, and leased the east half of it to him."

In 1891 Wilson sued D. R. Jones, or his tenant, in the federal court, claiming the land as swamp land, and Jones again appealed to the road company to protect his possession under its title. Cogswell testifies:

"The next conversation I had with him in regard to it was, I think, in 1891, when Henry [Wilson] sued, I think it was Jones' tenant. * * It was there in the federal court. * * Jones employed Judge Truitt, and they came down to my office, and they wanted me to write to Portland and get our attorneys there to intervene in the case, * * and I wrote to Dolph, Bellinger & Simon, attorneys at Portland, who were attorneys for the company."

Wilshire also testifies:

"He stated that he wanted to protect his possession, and in conversation stated to me that Kelpin told him that he could not hold the land by adverse possession, and that he would have to rely on the road company's title to defeat Wilson. * * He said that Kelpin told him that under his contract with the road company he could not hold the land in his own right. He afterward told me about having a lease or something, and could not claim adversely on account of it."

The conclusion is unavoidable that in 1874 there was a lease or contract between D. R. Jones and the company giving to Jones possession of this one half section, with preference right to purchase it from the company, and that Jones occupied the land under that lease and agreement until his death.

2. The existence of this lease and Jones' holding thereunder, as shown by the evidence, outweighs the testimony of statements made by Jones that he was claiming the land as his own or adversely to the company. The establishment of this lease discloses conclusively that Jones was not after 1874 claiming by pre-emptive right or otherwise under the government of the United States. This is also admitted by the testimony of Mrs. Jones, and there is nothing to indicate that in the year 1877, or at any time, Jones returned to the land, under any claim of ownership or right, other than under the Oregon Central Military Road Company and in recognition of its title. Jones in 1874 had abandoned his pre-emptive right, and knew and recognized that the company's selection had been approved, and to say that, when he returned to the land in 1877, his intention was to hold the land as his own, adverse to the road company, and in disregard of its title, is not a plausible account of the initiation of an adverse possession, and is wholly inconsistent with his recognition thereafter of his lease, and his possession under the lease must be presumed to con-

tinue until it is established by proof that he has surrendered or otherwise repudiated it, which is not shown here.

The decree, therefore, of the lower court is affirmed.

AFFIRMED.