Argued February 17; affirmed March 21; rehearing
denied April 25, 1933

# FIRST NATIONAL BANK OF EUGENE *v.*
# WILLIAMS ET AL.

(20 P. (2d) 222)

*D. B. Evans,* of Eugene (Immel & Evans, of Eugene on the brief) for appellant.

*Lawrence T. Harris,* of Eugene (C. A. Hardy and Harris, Smith & Bryson, all of Eugene, on the brief) for respondents.

BEAN, J. The record discloses that T. H. Williams was the owner of the real property, the buildings and all of the equipment with which the bakery business was conducted. No deed of the real estate was executed showing that a partnership owned any interest therein. There was no partnership agreement in writing and the testimony fails to establish that any agreement was ever made between the three persons mentioned to the effect that they should form a copartnership.

At the outset it should be noted that this is not a suit wherein third parties are interested so that the matter of holding themselves out to the public as partners would be material.

T. H. Williams was a man of unusual business ability and sturdy character. His integrity was unques-

tioned. He had never had any education and could not read or write, except to write his own name. He prospered in the bakery business, educated his children and, as contended by defendants, employed his two sons in the bakery business with him after they had attended the University of Oregon. The boys did not work full time in the bakery until after they left school. Mr. Williams was strict in his requirements in business but liberal in the compensation he paid his two sons. Each of them drew weekly wages, as did also T. H. Williams. For some time the salary was $40 a week for each; afterwards $50 and after a time $75, and in addition, from time to time, each of the boys received a bonus out of the profits of the business. When one of the boys would want to buy an automobile or build or purchase a house, they would tell their father they wanted some money. T. H. Williams would sign a check to the one who wanted the money, $500 or $1,000, and would also sign a check for an equal amount for the other son and himself, which was entered in the books as a bonus. The amount of the wages and bonus which the father and two sons received does not correspond to a division of the earnings on an equal profit-sharing basis.

T. H. Williams signed all the checks used in connection with the bakery business. The savings bank account was in the name of "T. H. Williams Bakery" and "Williams Butter Krust Bakery, by T. H. Williams," and there was also a personal savings account of T. H. Williams; also a commercial or checking account "Williams Bakery, by T. H. Williams". Neither of the boys was authorized to draw any money for himself or to pay out any money by check on account of the business. The testimony shows that T. H. Wil-

liams underwent two operations, first suffering the amputation of one leg, and later the other. On one occasion, while he was in the hospital, Basil T. Williams undertook to sign the checks for the payroll and the bank declined to pay them until authorized by T. H. Williams.

The testimony in the case is voluminous, consisting of some 450 pages, and is too lengthy to give anything more than a sample.

After Joseph C. Williams had a nervous breakdown, about 1924, and after he had been married about three years, through the influence of his wife, he tried to persuade T. H. Williams to incorporate the business and give each of the boys a share of the stock. T. H. Williams continuously and resolutely declined to do this. On several occasions when the question would arise during the years, after the alleged partnership and before Mr. Williams and Joseph died, T. H. Williams always asserted that the business and property belonged to himself, that it would remain so as long as he lived and after he died and his wife Minnie was gone, it would be time enough for it to go to the boys, but that as long as he lived he proposed to retain the ownership of the business and property for himself and then for his wife Minnie.

The testimony shows that Mr. Williams drew three wills, employing three different attorneys, and on the occasion of drawing each will emphatically directed the attorney that the will must be so drawn that after his death his widow should have the property for her use during her life, and then the boys, but the will must be so drawn that his property would not go outside of his family and into the hands of any of the Morks, the family of Joseph's wife.

Some twenty-seven witnesses testified to declarations of T. H. Williams to the effect that the bakery business belonged to him and that he proposed to keep it as his own business as long as he lived. All of his declarations during the time mentioned were in direct conflict with the proposition that there was any partnership. Neither does it appear that either of the boys mentioned the business as being a partnership, with the exception that in March, 1923, in making out the income tax return for the Williams Bakery, Basil T. Williams ignorantly used the partnership blank form in making out the tax report. Basil explains that they had not kept complete books prior to that time, so that they could arrive at the correct amount of income and expenses and had to rely on the accounts at the bank, and that the amount of the profits appeared very large, so he was advised to "split it" in three ways, which was done.

For the year 1922 account of receipts and expenditures was kept only after August 10 of that year. From that date until August 8, 1925, an account of receipts of the bakery business and the expenditures was kept, receipts being upon one page and expenditures on the opposite page of the ledger. Afterwards more extended account books were kept. Mr. I. D. Wood, of Portland, Oregon, a certified public accountant, who had been such for ten years, testified that in the spring of 1929 he set up for T. H. Williams a new system of books. With respect to the capital account, the ledger shows that account to be solely that of T. H. Williams. At that time Joseph stated to him that the business belonged to his father, that there was nothing to fix up in that connection, and that he received the same information from Basil. For that reason he set up the capital account for the father only.

The income tax returns were made in the same way each year, up to and including the year 1929, and were subscribed by T. H. Williams, who could not read the report and did not understand the matter. Basil T. Williams seemed to be of the opinion that after the returns had been made for several years in that way, when an accountant suggested that they were not correct, as the government had not complained, they were all right. Returns were made for the bakery to the State Industrial Accident Commission as though the business were a partnership.

While the boys and their father appear to have drawn equal amounts from the profits of the business, it does not appear that the boys shared in all of the profits. After the weekly wages were paid and the bonuses were paid, when there was sufficient amount of profits on hand, T. H. Williams would invest the same in stocks and bonds. The inventory and appraisement of the estate of T. H. Williams, deceased, shows that his real estate and equipment on hand and accounts receivable were $6,845, and the balance of $47,874.56 was invested in bonds.

The testimony of Astrid Williams, the widow of Joseph C. Williams, as we construe it, does not indicate that a partnership existed between T. H. Williams and his sons. She testified on cross-examination that the incorporation of the business had been a subject of conversation, and stated: "It was discussed from every point of view". She testified as follows:

"Q. Yes. What was T. H.'s objection to the incorporation? Was it the fact that he didn't want to do business that way, or was it because he didn't concede that the boys had any interest in the business?

"A. No, Mr. Williams said he had established the business and he wanted it in his own name as long as

he lived. He felt he had that coming, and he did have it coming, and that was all there was to it; and he said that an agreement was an agreement. His conversation was time and again, 'Williams won't cheat nobody,' and everything was fair and square and it didn't need to be incorporated. * * * he wanted to have it in his own name as long as he lived, and after he died it was to be in his wife's name as long as she lived, * * *."

Mrs. Astrid Williams testified that T. H. Williams never once said "that we were not partners".

It is plain from the declarations of T. H. Williams to Mrs. Astrid Williams that T. H. Williams did not intend that the property should be held by himself and sons as partners during his life or during the life of his wife, Minnie Williams.

At one time it was proposed to paint the inside of the bakery building. One of the boys and the bookkeeper wanted three coats. T. H. Williams declared the property was his and there would be only as much paint put on as he ordered, and he ordered two coats. In making changes in the building, work done by the carpenter was practically controlled in the same manner. He directed whatever he saw fit in regard to the business and his wish was obeyed. In the purchase of the larger articles used in the bakery such as flour, yeast, etc., T. H. Williams exercised his authority in purchasing same, even though contrary to the wishes of the boys. The same is true in regard to trucks and automobiles used in the business. The evidence shows that at one time Joseph wanted to buy a truck and Mr. Williams said: "If I wanted a truck I would buy a truck," and that the business was his. The testimony shows that at no time did Joseph C. Williams claim an interest in the business.

A representative of R. G. Dun & Company of Portland, Oregon, who called annually on the Williams Bakery, after 1921, to obtain financial reports and statements of the Williams Bakery, testified that all such reports, in effect, showed that T. H. Williams was the sole owner and proprietor of the business.

Basil T. Williams testified that at one time his father said to him: "If this bakery goes bankrupt, I am the guy that takes the jolt; * * * You boys can go out of here with a clean slate, a clean reputation * * *." This statement of Mr. Williams indicates that he was the one that would bear the losses of the business if there were any and that the boys were not to bear any loss.

Mrs. Ida Carson Adams, bookkeeper for Mr. Williams from September, 1926, to about the first of June, 1929, except during a short absence, testified that each of the boys received a weekly salary and an occasional bonus which was designated on the books as a bonus; that Minnie Williams, the wife of T. H. Williams, was also a beneficiary of the business; that she was required, every time a flour sack was sold, to enter it under the item "Flour sacks," which money went to Mrs. Williams, according to a custom that prevailed ever since the children were babies when the family lived at Hood River. She says at one time Joseph said: "We ought to have this business fixed in incorporated form". His father said, "Joe, have you saved enough money to buy an interest in this firm?" And Joseph said, "Why, no". Mr. Williams said, "Well, how could you incorporate when you don't own a dime in it?"

It is in evidence that in September, 1927, T. H. Williams prepared the assumed business name certifi-

cate which was filed in the office of the county clerk, showing T. H. Williams the sole owner of "Williams Bakery," which was the assumed name.

The fact that T. H. Williams held the title to the bakery property and all of the circumstances of the case taken as a whole and every act and assertion of T. H. Williams and his business dealings and the testimony of disinterested witnesses refute the claim that there was a partnership existing, as claimed. It seems almost incredible, if a partnership had existed for the long period of time which it is claimed, that it was not understood by T. H. Williams nor mentioned by either of the boys in a business way.

■ The first assignment of error is that the trial court erred on the direct examination of plaintiff's witness, Glen McCormick, when the privilege claimed by witness McCormick was sustained to the following question:

"Did you ever advise Bas Williams to make out an income return to the Federal Government based upon a partnership theory, after his having told you that the entire business of the Williams Bakery was owned solely by his father, and that there was no partnership?"

Plaintiff cites section 9-2102, Oregon Code 1930. Glen McCormick testified that he was not in the employ of the government in 1923 and 1924, and that he came to Eugene in 1925. Mr. McCormick refused to testify in relation to any matter coming to his knowledge in his official capacity without express authority from the Collector of Internal Revenue, and stated that he had been directed by the collector to refuse to answer in regard to any advice he had given in regard to the income tax return in connection with or to the person making the report. He declined to answer the question

for the reason that he was privileged therefrom by the regulations of the Treasury Department, and cited the regulation and authority to the effect that if he disobeyed the instruction he would be dismissed from the service and might incur criminal liability. The court ruled that the privilege was sustained. This ruling was made pursuant to section 3167, U. S. Rev. Stat., Regulation No. 45, approved April 7, 1919, pp. 220-225. There was no error in the ruling of the court.

In addition it ought to be noted that the testimony of Basil T. Williams, which was attempted to be disputed by the testimony of Glen McCormick, does not show that the person who advised him was informed that the entire business of the Williams Bakery was owned solely by his father or that there was no partnership.

As a second assignment of error plaintiff submits that the trial court erred in making findings of fact and in rendering a decree to the effect that there was no partnership; that the property in question belonged to T. H. Williams and that plaintiff is entitled to no interest in any thereof nor to an accounting therefor.

It may be of some assistance to refer to the definition of partnership and rules pertaining thereto. It is often stated that it is practically impossible to frame the definition of a partnership which will include all the cases which are in truth partners and exclude all others. A "partnership" is defined by Chancellor Kent as "a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profits and bear the loss in certain proportions". *Cogswell v. Wilson,* 11 Or. 371 (4 P. 1130); *Flower v. Barnekoff,* 20 Or. 132 (25 P. 370, 11 L. R. A.

149); *Willis v. Crawford,* 38 Or. 522 (63 P. 985, 64 P. 866, 53 L. R. A. 904); *Eilers Music House v. Reine,* 65 Or. 598 (133 P. 788); *Myers v. Olds,* 121 Or. 249 (252 P. 842).

■■ The existence of a partnership depends upon the intention of the parties, as determined by the agreement or their conduct. This is one of the most helpful tests. Story on Partnership (5th Ed.) § 2; *Call v. Linn,* 112 Or. 1 (228 P. 127). The interest of a copartner in the assets of a partnership consists of the net balance remaining after the payment of partnership liabilities and after the equities of the partners are established. *Eilers Music House v. Reine,* supra.

There is no one exclusive test for determining whether a partnership exists that is uniformly recognized. 47 C. J. 643, § 3. The prevailing view is that no arbitrary test is conclusive but that the existence of the relationship as between the parties thereto depends substantially upon their legal intent as manifest from the facts and circumstances involved in each particular case. 47 C. J. 663, § 56.

■■ An association as partners is not consistent with the relation of master and servant or employer and employee, and as a general rule, in order to constitute a partnership inter se, the community of interest between the parties must be of such a nature that it makes each member a coprincipal and an agent of all the members in the business with joint authority or right in the administration, control or disposal of the business or its property. 47 C. J. 666, § 60; *Hanthorn v. Quinn,* 42 Or. 1 (69 P. 817); *Gong v. Toy,* 85 Or. 209 (166 P. 50); *Worden v. Beals and Bennett,* 120 Or. 66 (250 P. 375).

■ It is now well-settled that the mere sharing of profits is not a conclusive test of a partnership inter se. 47 C. J. 668, § 61; *Willis v. Crawford,* supra.

■ Every case must stand upon its own merits. The court will seek to ascertain the intention of the parties as disclosed by the entire transaction. *Call v. Linn,* supra; *North Pac. Lbr. Co. v. Spore,* 44 Or. 462 (75 P. 890); *Northwestern Trans. Co. v. Investment Co.,* 81 Or. 75 (158 P. 281); *Whetstone v. Purdue,* 107 Or. 86 (213 P. 1014).

■ If there was no intention to form a partnership, as the testimony indicates in the present case, and the agreement is not such as manifests in law a partnership undertaking, but the relation of the parties is merely an arrangement whereby they are paid weekly wages and share a portion of the profits of a venture, as a compensation for services rendered, no partnership exists. *Northwestern Trans. Co. v. Investment Co.,* supra; *Hanthorn v. Quinn,* supra; *Willis v. Crawford,* supra; 47 C. J. 675, § 69. Unless the intent is clearly proved, the court will not construe a family arrangement as a partnership. 47 C. J. 657, § 47.

■ The testimony in the case taken as a whole conclusively shows that no partnership between T. H. Williams, Basil T. Williams and Joseph C. Williams existed. The allegations of the complaint are not sustained by the testimony. The findings and decree of the circuit court are correct.

Decree affirmed.

RAND, C. J., KELLY and BAILEY, JJ., concur.