Argued December 10, 1929; affirmed February 25; rehearing denied March 25, 1930

# COQUILLE MILL & TUG CO. *v.* ROBERT DOLLAR CO.

(285 P. 244)

*Hugh Montgomery* of San Francisco, Cal., (A. J. Sherwood of Coquille on the brief) for appellant.

*W. U. Douglas* of Marshfield and *A. C. Shaw* of Portland (Howard F. Chadbourne of San Francisco, Cal., and L. A. Liljeqvist of Marshfield on the brief) for respondent.

ROSSMAN, J. This is a suit in which the plaintiff prays for a decree quieting its title to a tract of land against a claim asserted by the defendant. The only issue before us is whether the defendant's claim is valid and should be recognized as such, or whether the decree of the circuit court, which quieted the plaintiff's title against it, should be affirmed. Since the parties are not in serious discord upon the following facts, and since a statement of them readily discloses the questions which they submit for our decision, we relate the succeeding circumstances. October 18, 1910, while the plaintiff was the owner of the timber land involved in this suit, it entered into a contract with the Randolph Lumber company, which recited:

"The party of the first part for the consideration hereinafter named agrees to sell, transfer and convey unto the party of the second part, its successors and assigns, and under the terms and conditions hereinafter set forth, all the stumpage contained upon the following described premises * * *.

"And the party of the second part agrees to purchase all of the stumpage upon the foregoing described premises at the prices and under the terms, conditions, and provisions hereinafter set forth."

The price stipulated by the contract for all timber cut and removed was $5 per thousand feet for white cedar and $2.25 per thousand feet for all other timber.

The contract did not specify the time within which the timber must be removed, unless that stipulation is contained in the following provision:

"The party of the second part agrees to commence active logging operations upon the premises herein-

before described in sufficient time to put in and agrees to put in and deliver at the Coquille river 20,000,000 feet of merchantable saw logs and of the kind hereinbefore provided for by the first day of January, 1913, and further agrees to cut and deliver and pay for 20,000,000 feet of merchantable saw logs each and every calendar year thereafter until all merchantable timber and of the kind hereinbefore specified shall be completely logged off the premises hereinbefore described and delivered at the Coquille river.

"It is further covenanted and agreed that the only income which the party of the first part has from its investment in the premises hereinbefore described is from the sale of stumpage from said land and that the said party of the first part desires to realize from the sale of said stumpage sufficient sum to pay all taxes which shall be assessed and levied against the same, to pay a reasonable interest on its investment and the expenses of fire protection thereof during the dry season of the recurring years and it is desirous of having said lands logged off as soon as possible after logging thereon is commenced for the reason aforesaid and for the reason that the danger from forest fires is much enhanced after logging is commenced thereon and the expense of fire wardens and fire protection is much increased after said logging operations are commenced and for the purpose of reimbursing the party of the first part and meeting the tax, interest and expense accounts as aforesaid, the party of the second part agrees to pay the party of the first part 25 cents per thousand feet for each and every thousand feet under 20,000,000 feet per annum it shall fail to log and pay for each calendar year during the term of this agreement and agrees to pay said 25 cents per thousand feet for said shortage of each calendar year on or before the first day of March of the succeeding calendar year, and the failure to pay such shortage by said time shall be subject to the same terms for the forfeiture and determination of all rights under this contract as the failure to pay the stumpage as is hereinbefore provided."

This contract was recorded in the deed records of Coos county, that being the county where the land was situated, and in the year 1914 was assigned to the defendant. Shortly thereafter the Randolph Lumber company was dissolved.

In 1912 the Randolph Lumber company built 6½ miles of logging railroad, and at the same time assembled the necessary equipment for conducting logging operations; shortly thereafter 14,230,514 feet of logs were cut and removed from the land. For these the plaintiff was paid approximately $40,000. No timber has been cut or removed since 1916; thus 14,230,514 feet constitutes the total amount cut under the contract. In the years 1916 and 1917 the defendant removed all of the equipment used for logging operations, including the logging railroad. At the same time it permitted the right of way to revert to those from whom it had been obtained. It likewise abandoned the camp buildings and other structures which had been used in connection with the logging operations; by 1918 all these buildings had disappeared. Thus the logging operations ceased, and since 1916 the defendant has neither cut nor removed any timber from this land. In 1918 it caused a cruise to be made of the timber; this showed 154,731,000 feet of merchantable timber. This amount, when added to the 14,230,514 feet previously cut indicates that when the contract was signed the land contained a total of 168,961,514 feet. The evidence warrants the conclusion that the logging railroad built by the Randolph Lumber company constituted a practical method of bringing out all of the logs upon the entire tract, provided minor extensions were made to it as the operations progressed. When the defendant quit logging it began to make annual

payments of $5,000 to the plaintiff under the provisions of the contract which required it to pay 25c per thousand feet for any deficiency in its operations less than a cut of 20,000,000 feet per annum. The last of these payments covered the year 1925. $5,000 tendered by it March 1, 1927, was rejected by the plaintiff, as was likewise a similar sum in 1928. These annual payments were apparently made by bank checks signed by the defendant. The check dated March 2, 1920, bore the following inscription upon its reverse side: "Indorsement hereon by payee constitutes receipt in full for the within account * * *. Penalty on contract dated October 18, 1910, for stumpage for year ending December 30, 1917. . . . $5,000." The defendant's check, dated January 15, 1924, bore on its reverse side the same preliminary general statement which was followed by the words "Account contract dated October 18, 1910 . . . $5,000." Upon the acceptance of the latter check, the plaintiff issued its receipt which stated: "Received from the Robert Dollar company the sum of $5,000 covering penalty due to failure to cut twenty million (20,000,000) feet of timber at twenty-five cents (25c) per M during the year 1923, as per terms of contract dated October 18, 1910, * * *." The other checks and receipts issued from 1920 to 1926 were similar in their recitals to the above. In the middle of 1925 the parties entered upon some negotiations which contemplated the consummation of a new contract concerning the defendant's purchase of this timber; these negotiations were conducted partly by correspondence. In one of the plaintiff's letters it expressed a hope for "a satisfactory adjustment of our respective rights and obligations under the contract of 1910"; another of its letters contained a similar statement

which seems to indicate that the plaintiff considered the contract still in effect at that time. In March of 1926 these negotiations came to an end without having produced any result. In this same period of time and for some years preceding it the plaintiff had urged the defendant to resume its operations and from time to time the defendant expressed a willingness to do so if the plaintiff would secure the necessary rights of way so that the defendant could construct a railroad into the timber. The plaintiff was not required by the contract to secure such grants, but nevertheless conducted with the property owners negotiations and from time to time informed the defendant of the results. Several proposals made by the owners of farms over which the railroad would pass were rejected by the defendant; in one instance it stated that the term of 12 years in the proposed leases was too short; when a new offer for 20 years was submitted it demanded ownership in fee simple; it rejected another proposal on the ground that the property owners demanded too great a price for the rights surrendered; finally the defendant expressed itself as no longer interested in obtaining a right of way, and stated that it would wait for an increase in the value of the timber.

March 19, 1926, the plaintiff, in writing, notified the defendant that it

"Hereby terminates its waiver of time of performance of that certain contract dated the 18th day of October, 1910, * * * and you are further notified that the undersigned, Coquille Mill and Tug company, hereby demands that you begin active logging operations on said real property described in said contract hereinabove set forth, not later than the first day of September, 1926, and diligently and actively continue

said logging operations, and remove annually twenty million (20,000,000) feet of merchantable saw logs in accordance with said contract, until all merchantable saw logs specified in said contract have been removed from said real property * * *. You are further notified that if you fail to commence active logging operations by the first of September, 1926, in accordance with this notice and demand and said contract hereinabove set forth, and fail to diligently and actively continue removing said logs as provided in said contract, the undersigned will commence a civil action against you to terminate any and all rights that you may have under said contract.''

The defendant ignored this notice.

The taxes upon the land involved in this suit from 1910 to 1927, inclusive, exceeded $70,000. In 1920 they were $5,068.56 and every year since then they have exceeded that sum except in 1926 when they were $4,857.82. In addition to paying these taxes the plaintiff expended substantial sums to protect its timber from fire hazard.

The defendant explained its failure to proceed with the logging operations by offering testimony that since 1916 the market for timber products has been adverse except upon two brief occasions. It contended that under such circumstances it would have been impractical to have constructed the necessary logging railroad and to have cut the timber. At the trial it made no offer to undertake logging again, but insisted that the period of time suggested in the notice just mentioned was too brief to enable it to resume operations; it urged that three years' time was necessary for that purpose. It declined, however, to promise a resumption of operations if the three-year period was allowed.

The answer prayed for a decree declaring the contract still in force, requiring the plaintiff to accept the

two tenders of $5,000 each covering the years 1926 and 1927, and allowing the defendant a "reasonable time to permit the defendant to perform said contract and remove said logs." The decree of the circuit court granted the relief sought by the complaint; the defendant has appealed.

The plaintiff contends that since the contract required the removal of 20,000,000 feet before January 1, 1913, and 20,000,000 feet each year thereafter, and since the total quantity upon the land did not exceed 170,000,000 feet, the time for the defendant's performance expired prior to January 1, 1922. The defendant urges that (1) the contract does not unconditionally require it to cut 20,000,000 feet per year; it contends that the covenant upon that subject is accompanied with a provision which permitted the buyer to elect whether it would cut and pay for that quantity of timber, or pay the plaintiff annually $5,000; (2) that the defendant's payment and the plaintiff's acceptance of $5,000 yearly, constituted a practical construction of the contract to the effect that the covenant just mentioned was an alternative one; (3) that the plaintiff's attitude in the past, evidenced by its acceptance of the $5,000 annual payments, led the defendant to believe that the plaintiff was constantly treating the contract as subsisting and that it should now be estopped from asserting that the defendant's time for removing the timber has expired, and (4) that if the defendant breached the contract the plaintiff waived the breach.

It seems desirable at the outset to determine whether the defendant's construction of the contract is correct to the effect that the promise made by the Randolph Lumber company, and accepted by the defendant, was an alternative one, which permitted the

former at its election to discharge performance by paying the plaintiff annually $5,000, or by cutting and paying for 20,000,000 feet of timber. The plaintiff construes these provisions of the contract, which we have previously quoted, as unconditional undertakings of the lumber company to cut and pay for 20,000,000 feet annually, accompanied with a provision for liquidated damages in the event the promissor failed to fully discharge its promise.

An alternative contract may present to the party thus favored a choice of performing his covenants by doing one of two or more acts, specified in the contract as performance of it. When such is the case he has fully discharged his covenant when he has performed the act selected by himself. Thus the payment of a sum of money, pursuant to an alternative covenant of such a contract, is the performance of the promise. Upon the other hand, if the covenant is not an alternative one, but exacts of the promissor payment of liquidated damages in the event he fails to perform the promised act, payment of the money is not performance but constitutes satisfaction for an injury inflicted by the breach.

■ Under the circumstances as they developed, the defendant is forced to construe the provisions requiring an annual cut of 20,000,000 feet, and the payment of 25 cents per thousand feet for any deficiency in the cut less than that amount, as alternative covenants. If it concedes that the latter provision is a stipulation for a penalty, it would be unenforceable (Williston on Contracts, §§ 776, 782) and, therefore, the requirement for an annual cut of 20,000,000 feet would be absolute. If it conceded that the provision for the money payment, aforementioned, was one for the payment of

liquidated damages, it would thereby likewise admit that the provision for an annual cut of 20,000,000 feet was absolute; the latter would be the duty and the stipulation for liquidated damages would be an incident thereto. The payment of damages is never the performance of the contract. Hence, since the provision for an annual cut was never complied with the plaintiff is forced to maintain that it was accompanied with an alternative.

It is to be observed from the provisions of the contract previously quoted that the Randolph company agreed ''to cut and deliver and pay for 20,000,000 feet of merchantable saw logs each and every calendar year * * * until all merchantable timber and of the kind hereinbefore specified shall be completely logged off the premises hereinbefore described and delivered at the Coquille river.'' So far the promise is absolute, unconditional, and not alternative. Preceding the words, just quoted, is another provision which required the promisor to commence ''active logging operations upon the premises * * * in sufficient time to put in * * * and deliver at the Coquille river 20,000,000 feet * * * by the first day of January, 1913.'' This promise likewise is direct and unconditional. The two evince a desire upon the part of the promisee at least to have the logging operations immediately begun and carried through expeditiously without halt to a conclusion. But, the defendant contends that the paragraph which follows these words qualifies them, modifies their unconditional promise, and reduces them to the level of an alternative, which it insists it finds, in the stipulation that the promisor must pay to the plaintiff ''25 cents per thousand feet for each and every thousand feet under 20,000,000 per annum it

shall fail to log and pay for each calendar year.'' If it was the purpose of the parties to thus qualify the the foregoing unconditional promise of the Randolph company, which indirectly fixed a definite time for the removal of all the timber; with an alternative, which when invoked, defeated this unconditional promise and postponed indefinitely the time for cutting the timber, it is certain that they expressed themselves in a most inapt manner. The words, which the defendant relies upon, are preceded by a recital of a group of stipulated facts, which of themselves constitute a powerful argument against its contention. These facts, which incidentally it would have been unnecessary to have recited if the defendant's contention is true, are (1) that the plaintiff has no income from this investment except ''from the sale of stumpage;'' (2) that it desires to realize from the sale of stumpage enough to pay taxes, a reasonable interest on its investment and the expenses of fire protection; (3) that it desires to have these lands ''logged off as soon as possible after logging thereon is commenced for the reason aforesaid and for the reason that the danger from forest fires is much enhanced after logging is commenced. * * *'' Thus it appears that the plaintiff was induced to accept the promise of the Randolph company for a prompt commencement of operations and an annual cut of 20,000,000 feet because it desired to convert a nonincome, expense-creating asset into a source of revenue, and these promises not only assured it a prompt liquidation of its investment, but also a hastening of the operations so that the fire hazard would not be unduly prolonged. It is clear from these facts that the plaintiff would not be equally satisfied whether (1) the promisor paid it $5,000 per year, or (2) pro-

ceeded with the above extensive logging operations. But, the defendant contends that the provision for cash payment in lieu of logging was inserted for the promisor's benefit so as to render the contract attractive to it. If this contention is true it would have been unnecessary, as previously noted, to have recited the group of stipulated facts. Moreover, such a construction would defeat the express purpose of the contract: an annual payment of $5,000 would not provide the plaintiff with "a reasonable interest on its investment" which consisted of 168,961,514 feet of timber worth $2.25 and $5 per thousand feet and upon which the taxes alone aggregated more than $5,000 yearly. Likewise it would not reduce the fire hazard.

■ We believe that we are warranted in taking notice of the facts that in all timber regions there is a very substantial constant risk that the timber may be destroyed by fire, and that as a tree passes its maturity it rapidly declines in value. These facts, together with those previously mentioned, persuade us that it would be unreasonable to believe that the plaintiff, for a consideration of a yearly payment of $5,000, granted to another an indeterminable privilege to buy this timber. A timbered area today containing 168,000,000 feet of merchantable logs may possess, a few years hence, very little timber of value, due to the ravages of fire, time and disease. In fact, the rule has been many times enunciated, that one who claims an unlimited and perpetual time for the removal of timber from the land of another, must establish it by clear and definite language in his deed or contract. Thus the court of our sister state, in which logging is also a major activity, has said:

"Parties may so frame their contract as to give the purchaser of timber an unlimited time for its removal;

but if this be the intention, it must be clearly and definitely expressed. Such a conveyance has the effect of practically ousting the owner of the soil from its use and enjoyment, and the law will not presume this to be the intent of the parties, unless the contract of sale clearly requires such a conclusion.''

*Hendrickson v. Lyons,* 121 Wash. 632 (209 P. 1095). From *Cummer v. Yager,* 75 Fla. 729 (79 So. 272), we quote:

''Although it is generally held that the parties to an agreement may, if they choose, make a contract whereby one will be entitled to a perpetual right to enter upon the land of the other and remove timber therefrom, it has been held in the majority of the decisions, and, as we have seen, this court is in accord with this holding, that such an agreement is so unreasonable in its nature that no contract will be held to have this effect unless it is plainly manifest from its terms that such was the intention of the parties.''

See to the same effect *Thomas v. Gates* (C. C. A.), 31 Fed. (2d) 828. Further cases to like effect are cited in all three decisions.

■ This contention, that the term for performance may be rendered indeterminable by paying annually $5,000, comes from the defendant, whose relationship to the contract is not that of a party, but only that of an assignee. It acquired the interest of the Randolph Lumber company upon an execution sale, and since that time has studiously refrained from assuming any of the promises made by that company. Under such circumstances it was not bound to perform the promises of its assignor, and no liability to the plaintiff arose out of the assignment: Pomeroy's Eq. Juris., § 22,741; 2 R. C. L., Assignments, p. 625, § 34; 5 C. J., Assignments, p. 976, § 169. The original purchaser, as previously stated, was dissolved many years ago; hence,

if we should adopt the defendant's contention that the covenant requiring an annual cut of 20,000,000 feet is accompanied with an alternative, which may postpone its performance indefinitely, the defendant could continue to pay $5,000 per year until fire, disease, or time had consumed all of the merchantable timber upon the tract and then return the contract to the plaintiff who thereupon could obtain relief against no one.

The language of the provision requiring payment by the buyer of a sum equal to 25 cents per thousand feet for any deficiency in the annual cut less than 20,000,000 feet is strongly suggestive of a stipulation for liquidated damages. The various recitals of facts, accompanying this provision, indicate that the plaintiff would be injured in a substantial sum if the buyer failed to cut the required amount. The rules governing the interpretation of agreements for liquidated damages were recently considered by us in *Secord v. Portland Shopping News,* 126 Or. 218 (269 P. 228), and we shall not repeat them here.

■ The above, we believe, is a fair statement and review of the various considerations to be borne in mind in determining whether the covenant, requiring an annual cut of 20,000,000 feet is absolute, or is accompanied with an alternative. They so clearly demand a construction that the promise is absolute and is free from any alternative, that we state our conclusion to that effect without reciting the reasoning whereby we came to it. The following cases, which rejected arguments similar to the defendant's, are somewhat in point: *Colleton M. & M. Co. v. Gruber* (D. C.), 7 Fed. (2d) 689; *Yelvington v. Short,* 111 Ark. 253 (163 S. W. 522). The defendant's very able argument has caused us to set forth our consideration of this contention more extensively than the matter possibly justifies.

■ It follows also from the conclusions just stated that we construe the contract as expressing a definite time for its performance as distinguished from a reasonable time.

■ The fact that the lumber market was adverse to profitable operation did not justify the defendant's cessation of operation: *Hanthorn v. Quinn,* 42 Or. 1 (69 P. 817); *Newton v. Warren, etc. Co.,* 116 Ark. 393 (173 S. W. 819).

■ The total quantity of timber upon the land did not exceed 170,000,000 feet and we have previously stated the amounts which the buyer was required to cut and pay for from time to time. Since we have held that his duty was an absolute one, it follows that in our opinion the term of the contract expired prior to January 1, 1922. This court, in harmony with the decisions of other courts, has several times held that when a logging contract specifies a definite term within which the buyer may remove the timber from the land of the seller, his right terminates at the conclusion of the term even though timber remains upon the land and the contract contains no provisions for a forfeiture: *Belt v. Matson,* 120 Or. 313 (252 P. 80); *Kee v. Carver,* 95 Or. 406 (187 P. 1116); *Kreinbring v. Mathews,* 81 Or. 243 (159 P. 75); *Anderson v. Miami Lumber Co.,* 59 Or. 149 (116 P. 1056); note, 15 A. L. R. 70 and 38 C. J., Logs and Logging, § 41, p. 163.

■ This contract, in our opinion, did not operate as a sale of the timber to the Randolph Lumber company. It was not required to pay for the logs until after the trees were felled; the plaintiff paid the taxes and assumed the fire risk. Under these circumstances the contract operated only as a permit or license which

authorized the Randolph company, or its assignee, to enter upon the premises and cut the timber: *Elliott v. Bloyd,* 40 Or. 326 (67 P. 202).

We come now to the defendant's contention that the parties during their operations under the contract placed upon it a practical construction which we should observe and apply. The conduct which the defendant relies upon is: (1) its payment and the plaintiff's acceptance of the annual $5,000 payments, (2) the recitals upon the checks by which it made payment, (3) the recitals in the plaintiff's receipts which acknowledge payment of these annual remittances, (4) statement in the plaintiff's letters, written in 1925 and 1926, during the course of the negotiations which contemplated the perfection of a new contract, and (5) statements in the planitiff's written notice to the defendant, dated March 19, 1926, which demanded that the defendant resume logging operations. We have previously quoted the recitals in the letters, checks, receipts and notice which the defendant relies upon. It contends that payment and receipt of the annual $5,000 remittances placed a practical construction upon the contract to the effect that such payments constituted performance of it, and that this construction is further evidenced by the recitals in the letters, receipts and checks which indicate that upon their dates the plaintiff regarded the contract as still in effect. The $5,000 annual payments remitted and accepted prior to 1922 we do not believe should be deemed evidence of a construction by the parties that performance could be rendered by making such payments in lieu of logging, because the plaintiff was entitled to retain those sums as liquidated damages. Furthermore many of those remittances and especially those in the period 1921 to 1925, inclusive, were accompanied with the requests, previously men-

tioned, that the plaintiff obtain for the defendant a new right of way for a logging railroad into this timber; thus when many of these payments were made the defendant intimated an intention of resuming operations. In 1925 the parties opened negotiations which contemplated the execution of a new contract; thus again the defendant indicated a purpose to proceed with its undertaking. These incidents render it reasonable to conclude that the plaintiff, when it accepted the payments, still believed that the defendant would eventually perform its undertaking. These circumstances do not justify a conclusion, that the conduct of the defendant in paying and the act of the plaintiff in accepting payment, effected a practical interpretation of the contract to the effect that the annual remittances constituted one method of performance. Moreover, the recitals in the writings upon which the defendant relies are themselves ambiguous; while some of them serve the defendant's proposed construction, others oppose it. We quote from the receipt thus: ''covering penalty due for failue to cut 20,000,000 feet * * * as per terms of contract * * *.'' The use of the word ''contract'' serves the defendant's purpose, but the word ''penalty'' indicates that the parties did not construe the payments as performance of the contract. Apparently the parties adopted the above form of receipt in 1917 when the first payment was made by the defendant. The words used were appropriate to the conditions then present. At that time neither was aware of the quantity of timber upon the land and both evidently believed that the defendant would soon resume its operations. Evidently the plaintiff accepted the 1917 payment as liquidated damages and signed the receipt, prepared by the defendant. Later the same language was employed in all subsequent checks

and receipts, even after it had lost its appropriateness. These being the circumstances attendant upon the execution of the writings prepared after 1922, their recitals possess but little persuasiveness. Moreover, it must be borne in mind that no one knew the precise quantity of timber upon this land, and hence the parties could not have been certain in what year the right of the defendant to cut the timber expired. There is still another reason why the use to which the defendant proposes to put this evidence is not available. Before evidence can be admitted establishing that the parties placed an interpretation upon their contract the latter must be ambiguous. If the meaning of the contract is plain, the acts of the parties can not prove a construction contrary to the plain meaning: Williston on Contracts, § 623; Jones Commentaries on Ev. (2d Ed.) § 1560; 22 C. J., Evidence, p. 1180, § 1574. Since we believe the covenant under consideration clearly was absolute and not conditional, evidence was inadmissible which would have modified it.

Before concluding our disposition of this contention of the defendant we shall quote the following apt observation made by the very able circuit judge who tried this case below: "The essential difficulty with the defendant's contention concerning 'practical construction' lies in the fact that there was far more ambiguity in the acts of the parties than there is in the original contract. If the parties put a practical construction on the contract, what was that construction?"

The defendant next contends that the plaintiff's conduct demands a finding that it should be estopped from asserting that the time for defendant's performance had expired. The conduct upon which it relies

is substantially the same as that enumerated above in regard to the defendant's contention concerning a practical construction of the contract. Before one can invoke an estoppel in pais against his adversary it must appear that the latter made a representation. As was said in *Bramwell v. Rowland,* 123 Or. 33 (261 P. 57):

"* * * In estoppel, the representation, whether expressed directly in words or transmitted by any of the infinite methods by which a thought may be communicated from one to another, has made known the party's position in regard to a material fact; from this position he would like to retreat, but the representee desires to hold him to that position. The injury has not yet been inflicted but the party invoking the estoppel says that, unless the representor is prevented from shifting his attitude, an injury will occur to the representee. * * * In estoppel it must appear that the representee relied so far upon the representation that it would be inequitable to permit the representor to shift the position which his representation announced."

See also *Security Savings & Trust Co. v. Portland Flour Mills Co.,* 124 Or. 276 (261 P. 432). From *Myers v. Olds,* 121 Or. 249 (252 P. 842), we quote:

"* * * Furthermore, it is a rule sustained by the highest of authority that a party setting up an estoppel by conduct must show that he exercised good faith and due diligence in endeavoring to ascertain the truth."

Applying these principles to the facts before us we find no conduct of the plaintiff's which the defendant could have construed as a definite representation that the plaintiff regarded the $5,000 annual payments as performance. We have already pointed out that when these payments were made the defendant indicated a purpose to resume operations. Next, even if a conclu-

sion was warranted that the plaintiff's conduct amounted to a representation that the payments were deemed performance, there is no evidence that the defendant relied upon such representations; no one in the defendant's behalf supplied such testimony. The defendant is not an ignorant member of the community dependent upon the plaintiff for advise, but is a corporation conducting vast business enterprises fully capable of determining its own course. In fact the evidence indicates that the defendant was not interested in the plaintiff's interpretations of the contract, but was hopeful that the annual payments, even after the plaintiff refused to accept them, would secure for it some interest in the plaintiff's timber. The parties maintained offices in the same city and the officers of the two frequently exchanged communications; if the defendant believed at that time that the annual payments were being accepted by the plaintiff as performance of the contract it would certainly have obtained a definite commitment to that effect. Under these circumstances we are satisfied that the defendant did not infer from the plaintiff's conduct that the term for performance could be postponed indefintely by further payments of like kind.

The evidence above reviewed, especially the defendant's many intimations of an intention to resume operations, and the several acts of the plaintiff in reliance thereon, evidenced by its efforts to secure for the defendant a right of way for a logging railroad, persuade us that the plaintiff never intended to waive performance of the provisions of the contract which requires an annual cut of 20,000,000 feet; the contention that the evidence establishes a waiver to that effect is, therefore, rejected.

■ However, the plaintiff continued to accept from the defendant annual payments of $5,000 after both parties must have known that the time for cutting the timber had expired. It is fair to assume that when the plaintiff accepted these payments it knew that the defendant expected to derive some benefit from making them. It is difficult to determine precisely what benefit the parties had in mind. If the intended benefit expired prior to the commencement of this suit its character and nature is immaterial; the last payment was made February 17, 1926, and this suit was filed February 15, 1927. Since we have concluded that the term for performance expired prior to 1922, and have likewise held that the plaintiff is not estopped from so asserting, whatever rights the defendant acquired after that time by making the payments arose out of them and not out of the contract. The statement just made meets with some opposition from the recitals in the receipts, checks, and the notice. We have previously pointed out that the same form of checks and receipts were used after 1922 as before without any notice being taken of the fact that in the meantime the relationship between the parties had changed; we also at that time stated that since the forms were continued without thought of their fitness very little weight should attach to their recitals. Those observations are as appropriate to the defendant's present contention as to the previous one. We shall presently consider the recitals in the notice which indicate that at the time of its preparation the plaintiff considered the contract still in force. It is certain that the payment and acceptance of the annual remittances, made after 1922, did not amount to a new execution of the contract year by year. In 1921 the taxes were $6,106.35; in 1922 they increased to $7,193.47 and in 1924 they

amounted to $7,366.06. In 1919 the cost of fire patrol for the protection of this timber was $62.23; in 1921, $84.46; in 1924, $240, and in 1925, $400. Thus since the expenses incurred by the plaintiff for carrying this investment increased materially at the time when the right of the defendant to cut the timber expired, we are satisfied that whatever privileges it granted the defendant for each $5,000 payment, made after that time, was of short duration. Our interpretation of the conduct of the parties in paying and receiving the annual sums after 1922 is in substantial accord with the judge of the circuit court who tried this case, and who thus expressed himself:

"I think we may safely say that the plaintiff did, so long as it accepted the $5,000 payment, offer to permit or license the defendant to enter upon the premises and cut the timber; but there was no term specified for such a license. * * * The statute of frauds is a powerful reason for construing any such license by implication to have been only for one year."

 We assume that a conclusion is warranted that the terms of the privilege thus procured by the defendant corresponded to those of the contract previously in effect, as to price, and the quantity of the annual cut. It will be observed that as long as the contract was in effect one year's payment constituted liquidated damages for the preceding year's default; but after the contract had expired there was no default for which the defendant owed redress. Under these circumstances the repetition of the payment year by year after 1922 would seem to warrant the conclusion that each payment was the consideration for the preceding year's license. The last payment was made in 1926; it was soon followed by the plaintiff's written demand that the defendant resume operations. If the agree-

ment existing between the parties had not made time of the essence, the demand accomplished that result: *Scott v. Smith,* 58 Or. 591 (115 P. 969) ; *Coles v. Meskimen,* 48 Or. 54 (85 P. 67) ; *Graham v. Merchant,* 43 Or. 294 (72 P. 1088) ; *Frink v. Thomas,* 20 Or. 265, 25 P. 717, 12 L. R. A. 239 ; *Knott v. Stephens,* 5 Or. 235. Whether the time allowed by the notice for renewal of operations was reasonable is immaterial because (1) the defendant ignored it; (2) it has nowhere expressed a purpose to resume operations under any circumstances, and (3) while its answer prays that the court grant it "a reasonable time" to perform the contract, it does not offer to bind itself to cut any timber if a reasonable time is allowed. We are of the opinion that if the plaintiff's acceptance of these $5,000 payments after 1922 granted the defendant a privilege or license to return to the land and resume logging the right expired before this suit was begun.

But, if the conduct of the parties after 1922 in paying and receiving these remittances constituted a waiver of the defendant's default, which was evidently the theory of the plaintiff when it prepared the notice, we are of the opinion that the defendant's rights expired prior to the commencement of this suit. Generally the fact that a party does not take advantage of an early breach of his contract by declaring it terminated, does not prevent him from asserting a subsequent breach: 13 C. J., Contracts, § 632, p. 607. The waiver of one breach does not amount to a waiver of subsequent breaches: Page on Contracts, § 3044. However, since a consideration was paid, the plaintiff could not act again until the period of time paid for had expired. Since the parties did not express themselves in regard to the length of time we must determine it from the surrounding circumstances. If this action

upon their part could be said to have extended the defendant's time for performance we are of the opinion that the extension was for one year only. We have reached this conclusion by the same reasoning above detailed.

■ We likewise believe that when this suit was filed the defendant was possessed of no unexpired rights which a court of equity was bound to protect. The $5,000 annual payments were not applicable upon the purchase price of the timber; those made prior to 1923 were payments of liquidated damages for breaches of the contract, and those made after 1922 bought for the defendant a privilege for one year of resuming the cutting of timber. The contract did not create in the defendant an estate in the timber upon condition subsequent, but granted to it only the right of free and undisturbed access to it. The license thus created conferred no interest in the land or the timber. Certainly the later oral agreement, arising by implication from the conduct of the parties, conferred no greater rights than those that arose from the written instrument. It follows, that since this defendant possessed nothing capable of a forfeiture, the decree below forfeited none of its rights: *Blackstone Mfg. Co. v. Allen,* 117 Va. 452 (85 S. E. 568). The decree of the circuit court is affirmed.

Coshow, C. J., Bean, J., and Hamilton, A. A. J., concur.