ALLIED PROPERTIES, Appellant, *v.* HAROLD JACOBSEN AND JOSEPHINE JACOBSEN, His Wife, Respondents.

No. 4164

HAROLD JACOBSEN AND JOSEPHINE JACOBSEN, His Wife, Appellants, *v.* ALLIED PROPERTIES, Respondent.

No. 4165

September 16, 1959                    343 P.2d 1016

*Orville R. Wilson,* of Elko, for Appellant and Cross-respondent.

*Williams & Mann,* of Elko, for Respondents and Cross-appellants.

**O P I N I O N**

By the Court, BADT, J.:

Allied Properties has appealed from a judgment against it and in favor of Harold Jacobsen and Josephine

Jacobsen, his wife, in the sum of $3,023.49 damages resulting from Allied's trespass de bonis asportatis by reason of Allied's removal of Jacobsen's cattle from the enclosed area known as Lime Mountain Field.

Jacobsen, in June 1952, placed certain of his cattle in the Lime Mountain Field, situate in the cattle country of northern Elko County, and Allied put them out of the field July 23, 1952. Jacobsen's action for damage for trespass de bonis asportatis followed.

The primary question presented to this court is whether the Jacobsen cattle, at the time they were turned out, were properly in the Lime Mountain Field (in which event notice should have been given to Jacobsen of Allied's intention so to do, 53 C.J.S. Licenses sec. 94, p. 821) or whether Jacobsen's cattle were then trespassing (in which event no notice to Jacobsen prior to removal was required. 2 Am.Jur. Animals sec. 126, p. 787). It is Jacobsen's contention that he had an annual license from Allied to graze his cattle in said field and that they were therefore properly there and could not be removed without prior notice to him. Allied concedes that it granted to Jacobsen a license to place certain steers in the field in June 1951, to graze in common with the steers of Allied and two other users, namely, Reed and Sharpe, for a limited period that season and contends that the license thus given was limited to that season and that when Jacobsen again placed his steers in Lime Mountain Field in June 1952 he was there without right and in trespass.

The question as thus presented is disarmingly simplified. The proper application of the law to the facts of this case requires a rather complete understanding of the situation under which the asserted license was given.

The Lime Mountain Field is an extremely large area, appearing from the map to be some six miles easterly and westerly and some five miles or more northerly and southerly. It appears roughly to be comprised one-half of the privately owned lands of Allied and Reed and one-half government land. It is traversed by what appear to be public roads, and a number of creeks flow into and out of it—Chicken Creek, Hot Creek, Deep Creek and

others. Bull Run Creek is to the north. The Reed properties are to the east. Allied also has very extensive properties to the north, to the east and to the west of the Lime Mountain Field and extending far to the west, to the neighborhood of the Deep Creek reservoir.

Mark Scott was Allied's foreman from 1936 to 1953. The Lime Mountain Field was partly surrounded by fences prior to 1936. The east boundary fence was in and part of the west boundary fence was in. The north boundary fence was built in 1943. The west fence had been built by the Garrats, Allied's predecessors, long before, but leaving about one and one-half miles of fence open. This gap was closed by the construction by Scott of the fence in 1947 or 1948 with the permission of Boyd Hammond, the range federal manager, upon obtaining the consent of other stock owners whose stock *drifted* into the area. As respondents' witness, Scott testified that, with the south end and the west side open, "they got so they was turning their cattle in there in the spring early, and that is the reason we put the fence in * * *. They were turning them out around Chicken Creek and down on Deep Creek inside this field." He described the operation of Lee Reborse, Jacobsen's predecessor. Reborse turned his cattle out down by the VN ranch, which appears from the map to be some nine or ten miles west of the westerly boundary of Lime Mountain Field. When he came back in the spring he would work his cattle, put his steers on the reserve and put his cows and calves in the Cornucopia area and along Canyon Creek and Chicken Creek, an area entirely outside the Lime Mountain Field. The only ones who turned stock into the Lime Mountain Field, and into the Lime Mountain area before the fence was closed, were Allied, Reed, and Sharpe. The only other livestock that got into the Lime Mountain Field after the fence was completed would be in the event "somebody might leave the gate down, or some crawl through the fence," and when the cattle were gathered later, there would always be some other cattle in it of various brands. Other stock that got into the field were stock of Tuffy Andrae, Jacobsen, Pio Achabal, Dr. Stevens, and Ellison. These other people

did not drive into that area. They did not "turn out" in the area. Jacobsen's predecessors did not turn out in that area. Only one, Tuffy Andrae, put some cattle in the area, "that is the reason we put the fence in." After the construction of the fence, a few drifted in through the fence or through gates or over cattle guards. These were cattle that had been grazing outside in the Taylor unit. The only three outfits that actually turned out in the Lime Mountain area "that really had a right to turn out [there]" were Allied, Sharpe, and Reed. This was up to the time that Andrae attempted to turn out there and was resisted.

All this presents the precise picture. The fence was built to keep Allied stock in the area (with Reed and Sharpe) and to keep other livestock out of the area. It was "not customary" for anyone to run in that field but Allied, Sharpe, and Reed.

The Bureau of Land Management,[1] through its range manager, Boyd Hammond, had granted oral permission to Allied to close the gaps in the fence upon obtaining consent of the stockowners whose stock drifted into the area. Such oral consent was not given pursuant to a formal written petition to be later acted upon by the Bureau of Land Management (after notice, etc., as contemplated by the terms of the Taylor Grazing Act, NRS 568.010 et seq.), but it was pursuant to such oral consent that Mark Scott, as Allied's foreman, completed the fences in 1947 and 1948. Allied, Reed, and Sharpe were granted grazing permits to run in common in this area. Scott contacted the neighbors, including Jacobsen's predecessor and, no objections being made, the fences were constructed, and thereafter Allied, Reed, and Sharpe turned their cattle into Lime Mountain Field in June of each year and had them all removed toward the end of July when the field had been grazed off. In 1951 and 1952 Jacobsen was given a permit by the BLM to run, after June 15, in the Taylor unit outside of this field, per customary use, and 100 percent on the public domain. His entire herd ran

[1]See footnotes 1 and 4 in Ansolabehere v. Laborde, 73 Nev. 93, 310 P.2d 842.

to about 250 head, which included about 60 steers. The size of the Allied outfit may be gleaned from the fact that in 1952 it was running about 1,400 steers (in addition to the Reed and Sharpe steers) in the Lime Mountain Field. This, to a cattleman, would indicate a complete herd of some 8,000 head of Allied's cattle.

It was under these circumstances that a conversation was had between Jacobsen and Scott that June morning, 1951. It is from such conversation under the circumstances recited, that it must be determined whether the license granted by Allied, through its foreman Scott, was restricted to the year 1951 (as contended by Allied) or continued on to 1952 and succeeding years, until revoked (as contended by Jacobsen).

Scott's testimony is brief. "I gave Jacobsen permission to put some cattle in the field. * * * around the first of June [1951] * * *. He met me and told me that he would like to put some cattle in there, I think he asked for about 50 head * * *. He was stuck for feed, so I gave him permission to put them in."

Jacobsen's statement was as follows: "Well, he [Scott] said that the Allied owned a large majority of the land lying in * * * the Lime Mountain Field, but he said it was also true that there was some of it that didn't belong to them and that our cattle had gone on in there in the past but he said we control it because of that and they had an agreement to build the fence with the unit users and so I said, well, if I were to agree to run the same type of cattle in there as yours, run my steers in there, I will have about sixty head, would it be all right with you to take up my use in that particular area with the steer use, and he agreed to it; * * *. He said that they ordinarily took their cattle in the last part of May, whenever the feed got good; they went according to the feed, and he asked if I would follow along the same line so we could work them together, which I agreed. * * * I said that I would. * * * I asked him about what time he took them out, and he said about the 1st of August, and I told him that that would agree with my working too, although I didn't know how long it would take me to hay, but as long as the hay was up and I had a field,

I would move mine out." He then described in some detail his proposed change of operation by putting his cows and calves on the forest reserve (instead of steers as done by his predecessor) and finding other pasture for his steers in July and until his hay lands could receive them after haying. He testifies further:

"I said [to Mark Scott] that I would run the same type of livestock during the same season, approximately * * *. I told them that I probably couldn't get mine out as soon as they did because of my haying, but as soon as I got the hayfield ready, it would work out fine. * * * If I used the words in my former testimony that I would follow the pattern of operations of the Allied, it wasn't that I was going to do whatever they said."

Scott did not deny any of these statements, nor did Jacobsen deny Scott's testimony as quoted above. The case was not submitted to the trial court for several months after the evidence was concluded. The court then issued an "opinion from the bench" containing sundry findings and conclusions. The trial court stated that it was unable to cope with the question of damages and recommended either a new trial on the issue of damages or that a transcript of the testimony be prepared. It is obvious that after the long period following the trial, without a transcript of the testimony, the court had equal difficulty in recalling the testimony as to the extent of the license granted. The court recited that the fences were closed in 1951, whereas they had been closed in 1947 and 1948. The court recited that Jacobsen would not protest the building of the fences after Scott had granted Jacobsen permission "to graze annually a limited number of steer cattle for a specified period." As noted, the fences were built in 1947 and 1948, when Jacobsen was not in the cattle business in the vicinity. The consent to building the fence had been given by one of Jacobsen's predecessors, and with no conditions attached. The court's statement indicates something in the nature of an agreement for a consideration. Such is nowhere claimed by Jacobsen. The court refers to the years herein involved as 1952 and 1953. It is conceded that these years were 1951 and 1952. That Jacobsen was

granted a license "to graze annually" a number of steers appears nowhere in the testimony.

We are confronted with the quite definite fact that Scott, in granting the license to Jacobsen, did not in words specify that it was to be limited to the 1951 use only. Nor did Jacobsen, despite the length and fluency of his testimony, say that the license was to graze his steers in Lime Mountain Field annually, or for a continuing period, or for any number of years, or until he received notice of revocation, or any other words to such effect.

With reference then to the tenure of the license, we can recognize two situations.

(1) Where the use for which the license is required is a continuing use, in which instance the license coextensive with the use would be a continuing license. Permission once granted would in such case be deemed to continue until revoked. See Cary Hardware Co. v. McCarty, 10 Colo.App. 200, 50 P. 744.

(2) Where the license is for a specific purpose to accomplish a specific act. Once the act and purpose have been completed, the license is then terminated. See Thayer v. Brainerd, D.C.Mun.App., 47 A.2d 787.

Between these two might be said to fall cases in which a license is for a specific purpose, but it is to be recognized that the need to accomplish this purpose would be recurring at regular intervals. In such instances the permission might expressly be for a continuing use. Where there is no express consent nor any express limitation the question whether the license is to extend for a single exercise or is to include recurring use in the future would have to depend upon the circumstances of the particular case. If the licensor and licensee should reasonably expect that for each separate use of the land for the desired purpose permission should be asked, then it should be presumed that permission granted is for the single use.

Such would seem to be the case here. Even though a

licensor recognizes that the licensee's need for pasture will be recurring each year, still, in the normal course of human relations, and particularly under the conditions here pictured, he would be entitled to expect that the licensee would request permission to graze in his field on each occasion, and the licensee should certainly feel obliged to request permission each year.

The same would seem to be true in many seasonal uses, those occurring annually, since circumstances might well change from year to year and permission granted for one year without express limitation or express reference to the future should be deemed to apply to that year only.

■■■■■■■■

In such cases, then, they should be held to fall within the rule applying to a license for a specific act, and the fact that the need for the license will be recurring each year is not enough, in law, to warrant a construction of the license as a continuing one in the absence of an express consent or a consent necessarily implied through conduct or acquiescence of the licensor.

■■■■■■■■■

Such conclusion is supported by well-established principles of law, under the most clearly applicable of which Jacobsen had the burden of proving his license to graze his steers in the Lime Mountain Field in 1952. See 33 Am.Jur. License sec. 112, p. 415. His license for a limited period in 1951, not disputed by Allied, obviously did not in itself meet this burden. Reliance on the conversation between Jacobsen and Scott, in which neither party mentioned the term of the license, threw an even stronger burden on Jacobsen. "Since the parties did not express themselves in regard to the length of time, we must determine it from the surrounding circumstances." Coquille Mill & Tug Co. v. Robert Dollar Co., 132 Ore. 453, 285 P. 244, 253. In the same case it was said that a license for an unlimited time to enter on another's land for the removal of timber therefrom was so unreasonable in its nature that no contract would be held to have such effect "unless it is plainly manifest from its terms

that such was the intention of the parties." It is true that the Coquille case is distinguishable in several respects. It is a logging case, not in complete analogy with a grazing case, and a considerable body of law has evolved in the northwest timber region covering such cases, in one of which (Hendrickson v. Lyons, 121 Wash. 632, 209 P. 1095) it was noted that granting to a purchaser of timber an unlimited time for its removal has the effect of practically ousting the owner of the soil from its use and enjoyment, an intention which (as stated in Cummer Co. v. Yager, 75 Fla. 729, 79 So. 272) the law will not presume "unless the contract of sale clearly requires such a conclusion." A body of law has likewise evolved in the western states where livestock are grazed on the public domain, growing out of customary use protected by the police powers of the states and the private ownership of strategic lands and watering places; and later growing out of permits issued by the Secretary of the Interior or the Bureau of Land Management. Instead of growing timber these grazing lands produce an annual forage crop, whose consumption by the livestock of others ousts the owner or the permittee pro tanto from its use and enjoyment. Access to spring, summer or fall range, as the case may be, is as essential to a livestock operation in the west as is the irrigated land that produces the winter feed, or as is the ownership of the livestock itself. Accordingly a continuing license to graze livestock on the range of another for an unlimited number of years may be implied only on a clear showing that such was the intention of the licensor.

It follows that Jacobsen was in trespass from the time he turned his steers into the Lime Mountain Field in 1952, and that the peaceful removal of his steers from the field to a grazing area of the public domain covered by Jacobsen's grazing permit from the Bureau of Land Management did not subject Allied to Jacobsen's action for trespass de bonis asportatis.

Respondent insists that by reason of the provisions of the range code Allied was barred from all authority to

remove Jacobsen's livestock even if they were concededly in trespass; that power of removal of trespassing livestock was exclusively vested in the Bureau of Land Management; and that removal by Allied without notice subjected the latter to Jacobsen's action for damages even if Jacobsen's cattle were in trespass. Such was the conclusion of the trial court, and in this we think the court erred. Whether the cattle were in trespass or not was not a federal question under federal law. Garcia v. Sumrall, 58 Ariz. 526, 121 P.2d 640. The question depended on the existence of a private agreement. There was no occasion to refer to BLM for any determination of Jacobsen's right to the use of the field. If he had no right to be there, then he has suffered no damage through breach of any right he possessed unless, and only unless, he was injured by the manner in which the cattle were removed. There is no indication that such was the case. The damage resulted from not permitting the cattle to remain where they were. To allow a recovery for such damage simply because they were removed by Allied and not by BLM would be to recognize in Jacobsen a right to trespass and to permit him to profit by his own wrong. Thus, having failed to show a right to be where he was or to show damage resulting from the manner in which his cattle were removed, he cannot complain because the removal was effected by Allied rather than by BLM, since such removal has not injured him in any right possessed by him.

It has been noted that the manager of the Bureau of Land Management granted authority to Allied to fence the field comprising an area containing privately owned as well as public land. This was a practical solution of a practical problem which eliminated the possibility of range disputes within the area. Drift rights are not in question. If this was a workable solution within the power of the Bureau of Land Management, it would be such only if it included the right of the grantees to remove trespassing cattle. This court is not disposed to destroy the workability of such an arrangement and thus destroy the authority of federal range managers to enter into arrangements of this nature.

Nor do we think that the informality in which permission to close the fence was granted can be asserted by Jacobsen in view of the consent of his predecessor in interest. Such consent, in our opinion, is a waiver of the right now to raise the point.

Jacobsen filed a cross-appeal, contending that additional damages should have been allowed. Since the judgment in favor of Jacobsen must be reversed, his cross-appeal is dismissed.

Reversed with costs.

McNAMEE, C. J., and MERRILL, J., concur.